Charles Gothberg, Sr., Individually and as Father and Natural Guardian of Leroy Gothberg, a Minor, Judgment Creditor, and O. Alfred Lundberg, Individually and as Father and Natural Guardian of Eloise Elaine Lundberg, a Minor, Judgment Creditor, Plaintiffs-Appellees, v. Leo Nemerovski, d/b/a Illinois State Auto Insurance Agency, Defendant-Appellant.

Gen. No. 49,834.

First District, First Division.

April 26, 1965.

Kahn, Adsit & Arnstein, of Chicago (John F. Mc-Clure and John D. Cummins, of counsel), for appellant.

Philip G. Brennan and Robert J. Martineau, of Chicago (Philip G. Brennan, of counsel), for appellees.

MR. JUSTICE MURPHY delivered the opinion of the court.

Defendant, a licensed insurance broker, appeals from a $20,000 judgment entered against him in a nonjury trial. Defendant, having failed to perform his contract to procure public liability insurance covering Ronald Jackson, was held to stand in the place of the intended insurer and to be liable on judgments against Jackson, secured by the plaintiffs, to the extent of the coverage ordered.

Defendant asserts (1) that he had no duty, as a matter of law, to obtain insurance coverage for Jackson before the date of the occurrence which resulted in the subject judgments against Jackson, and (2) plaintiffs, not being parties to the contract to procure insurance, have no cause of action against defendant for a breach, if any, of this contract.

On December 10, 1956, Ronald Jackson, a minor, telephoned the office of the Illinois State Auto Insurance Agency, a sole proprietorship operated by the defendant, Leo Nemerovski. In response to the call, Albert Levenstein visited Jackson's home on December 11, 1956. In the presence of Mrs. Jackson, his stepmother, Jackson and Levenstein discussed insurance coverage. Terms were agreed upon, and an ititial payment of $10 was made by Jackson to Levenstein. A receipt of the "Illinois State Auto Insurance Agency,"

374

dated December 11, 1956, and signed by Levenstein, as agent, was given to Jackson. Levenstein then told Jackson and his mother, in response to their inquiry, that the policy would go into effect when he returned to the office "within an hour." On the face of the receipt given to Jackson was stamped, "The Insurance For Which You Have Applied For Which This Is A Payment On Account Is Not Effective Until A Written Binder Or Policy Is Issued And Delivered."

Several days later, Jackson received a form letter on the letterhead of the "Illinois State Auto Insurance Agency," signed by "Leo Nemerovski." It opened with, "It is with sincere pleasure that we welcome you into our large and growing family of protected and satisfied policyholders. Our Mr. Levenstein has informed us that your insurance has been ordered as of December 12, 1956. The down payment required was $35.40 towards which you have paid $10 leaving a balance of $25.40 which must be paid . . . by December 31, 1956 . . . . [W]hen the final payment has been made your policy will be mailed to you." The notice that was stamped on the receipt for $10 was also stamped on the letter. Under the heading of "Important," was printed: "If for some reason you find it impossible to make any of the payments on time, please telephone our office *immediately* so that we will understand and be able to help you with your problem, and thereby continue your insurance protection." (Emphasis supplied.)

The letter was first read by Mrs. Jackson, and after a discussion with her, Jackson telephoned the Illinois State Auto Agency. He asked to speak with Levenstein, and was told by a woman who answered the phone that Levenstein was not in the office. In response to her offer of assistance, he told her that he "didn't quite understand the letter" of December 12, 1956; "that the letter led me to believe that I was

375

insured and that after I read it I didn't understand whether I was or not." Indicating that she had Jackson's file in front of her, she said, "You have nothing to worry about. You have insurance as of December 12th because the application for the policy left here on December 14th." Jackson then asked "if she could please repeat that to my mother because the car was in my father's name and I couldn't drive it until she knew that I was insured. She said, yes, she would repeat it. I then handed the telephone to my stepmother, and she spoke into it."

Jackson then began to drive the automobile and on December 23, 1956, was involved in an automobile collision in the State of Minnesota. On December 26, 1956, Jackson went to defendant's office and asked if his policy had "come in yet," as he wanted to report an accident. A woman in the office told him, "Well, if your—if the policy is dated after the accident your insurance wasn't in effect, so therefore it wasn't covered," and Jackson left the office.

Jackson continued to make the payments as agreed with Levenstein on December 11, 1956, and Prudence Mutual Casualty Company issued a policy covering Jackson, effective January 15, 1957.

Plaintiffs filed two separate actions in Minnesota against Jackson, on which they obtained default judgments in 1959. On April 21, 1960, plaintiffs sued defendant Nemerovski and Prudence Mutual to recover the limits of the policy, which they claim should have been procured for Jackson before the occurrence. Before trial and on motion of plaintiffs, Prudence Mutual was dismissed as a party defendant. The trial proceeded against Nemerovski, and judgment was entered against him for the limits of the policy ultimately issued to Jackson by Prudence Mutual.

Initially, defendant contends (1) the acceptance by defendant of Ronald Jackson's application for insur-

ance was a "conditional acceptance"; (2) defendant was under no legal duty to procure insurance until Ronald Jackson paid the required initial premium; and (3) there was no competent evidence to show that the effective starting date of the insurance would be prior to the receipt of the full down payment.

As to the meeting with Levenstein on December 11, 1956, Jackson testified, "I asked Mr. Levenstein how much of a down payment was required to make the policy effective, and he said $10. He also said that I would have three payments to make on the policy. I gave him the $10 and he gave me a receipt. After he gave me the receipt, my mother asked him when the policy would go into effect. He said the minute he got back to the office and put it on file the policy would go into effect. He said that he intended to return to the office within an hour." Jackson further testified as to his telephone call of December 12, 1956, and his visit to defendant's office on December 26, 1956.

Mrs. Jackson testified that on December 11, 1956, Levenstein came to their home and they went into the living room. Present were "my son Ronald and a companion by the name of Billy Joe Stroud. There was a conversation regarding different types of automobile insurance. An application for automobile insurance was made out, and my son gave him a payment of $10 toward the insurance. I asked Mr. Levenstein when this insurance would become effective, as the car was in my husband's name and we wouldn't let Ronald drive it until he was covered by insurance. He told me that Ronald would be covered as soon as he returned to his office and filed his application in about an hour." Mrs. Jackson further testified about the receipt of the letter of December 12, 1956, and her part in the telephone conversation. "I identified myself and told the other party that we had received plaintiff's exhibit 1 [letter of December 12, 1956] and that neither

377

I nor my son could understand it. We read the letter thanking us for placing the policy and then there was a stamp at the bottom and we don't understand it, and I wanted to know if he [Ronald Jackson] was covered or not. . . . She assured me that he was fully covered because the policy had been applied for and was mailed out of their office on the 14th of December, 1956." Also, Mrs. Jackson identified Levenstein in open court.

Defendant Nemerovski testified that he was the sole owner of the Illinois State Auto Insurance Agency. He was a broker, licensed to sell insurance and represent persons in the procuring of insurance. During the period from November 1956 through February 1957, he personally employed no female employees. The total amount of premium received for the policy of insurance issued to Ronald Jackson was $101.40. Of this amount, $64.08 represented the premium and the balance represented a service charge for financing the payment of the premiums. "When an uninsured person applies for insurance, the general custom is to issue the policy as of the date of the application for insurance, even though the policy might not be issued for a week or more thereafter. When a policy of insurance is ordered by a broker, whether through an agent or another broker, or directly from the company, the issued policy is delivered to the ordering broker or agent of the particular company and not to the insured."

The Prudence Mutual policy issued to Jackson "was not delivered from the company to me but to C. Waters, as the broker. He later delivered it to me. I did not deliver that policy to Ronald Jackson, but I have retained it in my files. . . . The $10 payment by Ronald Jackson towards the down payment for his insurance was received by Mr. Al Levenstein on December 12, 1956, and forwarded to me. He was the broker who solicited the business. I furnished him with forms

of receipt that he was to issue when he received any payment." Levenstein was paid for his services on a commission basis.

On cross-examination, Nemerovski testified that when financing a policy, "it is customary to hold the original policy so that in case of a delinquency we have it in our possession to return for cancellation. The insurance company looked to me, not the insured, for the premium. The insurance company was not interested in the fact that I financed the policy. The insurance policy would be dated the day following the day on which I ordered it. I did not send the application of Ronald Jackson to the insurance company until sometime in January when I received the balance of his down payment. That was in line with the agreement. When I say 'that was the agreement,' I don't know what the conversation was between Ronald Jackson and Al Levenstein; but that was the system that I had. The reason for making no application for insurance coverage of the type applied for by Ronald Jackson until the down payment had been received is as follows: When we order a policy, we are liable for the premium. If I order a policy with no money, or with a few dollars, and the balance is not paid, then the policy has to be cancelled and I would have to pay for the earned premium. If I had received the down payment on December 12, 1956, I would have ordered the policy at that time."

Albert Levenstein testified that he called on Jackson at his home on December 10th or 11th in the afternoon. "At this meeting only Mr. Jackson and myself were present. There was no one else. Our discussion took place in the living room of Mr. Jackson's home. . . . I showed him what the coverages were that were afforded, $10,000 for injury to one person, $20,000 if there were two or more people involved in the accident and $5,000 for property damage to others. I may have gone

into a much more detailed explanation. We normally do. Then I told him what it would cost to obtain this insurance and the breakdown of the payment schedule. I said that $35.40 would be the required down payment. Mr. Jackson related that he did not have the full $35.40, but only $10, and asked me whether this would insure him. I said that this would not. I took the $10 from him with the stipulation that this was a deposit against the down payment and that there was no coverage afforded with the $10. The normal procedure on any application that I wrote would be the full down payment must be paid. . . . I did not have any conversation with Mrs. Jackson." On cross-examination, he testified, "I did not have anything to do directly with sending plaintiff's Exhibit 1 [letter of December 12, 1956]."

 Defendant cites Snow v. Schulman, 352 Ill 63, 185 NE 262 (1933), to show that "to constitute a contract by offer and acceptance the acceptance must conform exactly to the offer . . . ." Jennings v. Illinois Automobile Club, 319 Ill App 587, 49 NE2d 847 (1943), is cited to show that "[I]t is an elementary rule that where an acceptance is qualified by a specific statement of the obligation to be assumed, there is either a contract in the terms of the acceptance or no contract at all." From these authorities, defendant argues that "in the case at bar any contract to procure insurance was conditioned upon a written binder or policy being issued and delivered, or there was no contract. . . . both the receipt given to Ronald for his $10 and the letter to Ronald from Mr. Nemerovski contained the condition that the insurance was not effective until a written binder or policy was issued and delivered. No testimony by Ronald Jackson can alter the fact that the defendant's acceptance was qualified."

The weight of the evidence as to what occurred on December 11, 1956, indicates that Levenstein's acceptance of the contract to procure insurance was not qualified. (Chamblin v. New York Life Ins. Co., 292 Ill App 532, 538, 11 NE2d 836 (1937).) Jackson and his mother made it clear they wanted insurance coverage on December 11, 1956, and not later. Levenstein told them the policy would go into effect within an hour. At the top of the $10 receipt, "12/11/56" is inserted under the printed words "Date of contract." The receipt further states the $10 is "to apply on premium(s) and charges in accordance with contract(s) dated ———." The letter of December 12, 1956, welcomed Jackson "into our large and growing family of protected and satisfied policyholders," and warned him if he could not make the payments to "please telephone our office *immediately* so that we will understand and be able to help you with your problem, and thereby continue your insurance protection." (Emphasis supplied.) The letter further stated that "your insurance has been ordered as of December 12, 1956." From the language of both of these documents, we believe that any reasonable man would conclude that he had existent coverage.

However, defendant argues that his acceptance of the contract to procure insurance was qualified because of the notice, stamped on both the receipt and letter, which stated that the insurance was not effective "until a written binder or policy is *issued and delivered.*" (Emphasis supplied.)

■ We think the purport of the stamp is ambiguous, and that the ambiguity is heightened by the statement in the letter that the policy will be delivered, mailed, to the insured when the final payment has been made. Under the facts present here, the average person seeking insurance coverage, would have difficulty understanding the effect of this stamp. Neither

Jackson nor his mother understood it, and attempted to procure a clarification by immediately telephoning defendant's office. The rule to be applied here is that "where a provision is ambiguous, the contract is construed against the drafter of the instrument." Maretti v. Midland Nat. Ins. Co., 42 Ill App2d 17, 28, 190 NE2d 597 (1963).

The evidence of the procedure followed by Jackson and his mother, to definitely ascertain the date on which insurance coverage would begin, is competent extrinsic evidence to demonstrate that defendant contracted to procure insurance coverage commencing "prior to the receipt of the full down payment." (Ouska v. Pearson, 291 Ill App 6, 9 NE2d 69 (1937).) Jackson telephoned defendant's office immediately, using the telephone number set forth on the letterhead. He asked to speak with Levenstein and was informed by the woman who answered the phone that he was not in the office. She asked if she could help, at which time both Jackson and his mother informed her of their concern about the effective date of Jackson's coverage, and she told them both that he had insurance "as of December 12th." We note that although defendant testified that he did not have any female employees during the period in question, he did testify on cross-examination that there was a typist named Dorothy Eaton employed by "Wells Insurance Agency, Inc.," and that "Wells Insurance" occupied the same quarters and used the same telephone number. Also, the letter of December 12, 1956, contains the initials "LN:de" after the signature of "Leo Nemerovski."

As was said in Korch for use of Doody v. Indemnity Ins. Co., 329 Ill App 96, 101, 67 NE2d 298 (1946):

" . . . [A]nyone who answers a telephone call at a place of business is presumed to speak for the company in respect to the general business

carried on by such company; that a business concern, by installing a telephone to be used in the transaction of its affairs, impliedly invites the public to make use of that means of communication which is thereby made an agency for the transaction of its business, and persons dealing with it by telephone have the right to assume that the one answering the telephone of the company is clothed with authority to transact the business conducted."

We believe this conversation was competent evidence to be considered in construing the stamp which appeared on both the receipt and letter.

The essential elements of a contract to procure insurance are present in this record. "It is sufficient if one of the parties to such a contract proposes to be insured and the other party agrees to insure, and the subject, the period, the amount and the rate of insurance are ascertained or understood and the premium paid if demanded." (Cottingham v. National Mut. Church Ins. Co., 290 Ill 26, 32, 124 NE 822 (1919).) It is also the rule that "preliminary contracts to insure may be proved by parol as well as written evidence," and there is competent evidence here "from which it may be implied that the parties understood the period of coverage, the amount of the policy, or the rate of insurance." Pimentil v. Milo Brooke, Inc., 11 Ill App2d 201, 203, 204, 136 NE2d 608 (1956).

We hold the trial court was correct in finding that defendant unconditionally undertook to procure public liability insurance for Ronald Jackson, effective on December 12, 1956.

The measure of damages for the breach of a contract to procure insurance is to be determined by the terms of the policy which the broker failed to pro-

cure. It is said in Johnson v. Illini Mut. Ins. Co., 18 Ill App2d 211, 216, 151 NE2d 634 (1958):

> "If a broker neglects to procure insurance or does not follow instructions when obligated so to do, or if the policy obtained is void or materially defective through the broker's fault, or if the principal suffers damage by reason of any mistake or act of omission or commission of the broker, the broker is liable to his principal for any loss he may have sustained thereby."

It is undisputed that on January 14, 1957, without any further negotiations as to the terms of the policy, defendant ordered a policy for Jackson which was issued by Prudence Mutual Casualty Company, effective January 15, 1957 (plaintiff's Exhibit 3, produced by defendant). With the exception of the inception date, this policy determined the liability of defendant to the same extent as the insurer would have been liable had the policy issued as of December 12, 1956. Cottingham v. Nat. Church Ins. Co., 290 Ill 26, 33, 124 NE 822.

We consider next defendant's contention that, as a matter of law, plaintiffs have no standing to sue defendant directly for breach of his agreement with Jackson. Defendant argues there is no statute in Illinois, applicable to defendant, which authorizes a right of recovery against him by these plaintiffs, and there is no policy of insurance which contains a provision permitting this action. Defendant further argues that he was acting solely as the agent of Ronald Jackson (Moone v. Commercial Cas. Ins. Co., 350 Ill App 328, 336, 112 NE2d 626 (1953)); and that "the principles of law applicable to principal and agent govern their respective rights and liabilities," (City of Chicago v. Barnett, 404 Ill 136, 88 NE2d 477 (1949)); "an agent is liable *only* to his principal for a mere breach

of contract," (Baird & Bradley v. Shipman, 33 Ill App 503 (1889)); "an agent is not responsible to a third person for injury resulting from mere nonfeasance, meaning by that term the omission of the agent to perform a duty owed solely to his principal by reason of agency, . . . ." 3 CJS, Agency, § 223, p 134; 3 Am Jur2d, Agency, § 300, p 661.

In substance, defendant contends that the plaintiffs cannot recover under the third party beneficiary doctrine because the contract was not made for their direct benefit, and, if anything, they are only incidental beneficiaries. Defendant argues for the application of the rule stated in Carson Pirie Scott & Co. v. Parrett, 346 Ill 252, 257, 258, 178 NE 498 (1931):

> "The test is whether the benefit to the third person is direct to him or is but an incidental benefit to him arising from the contract. If direct he may sue on the contract; if incidental he has no right of recovery thereon. . . .
>
> ". . . The rule is, that the right of a third party benefited by a contract to sue thereon rests upon the liability of the promisor, and this liability must affirmatively appear from the language of the instrument when properly interpreted and construed. The liability so appearing can not be extended or enlarged on the ground, alone, that the situation and circumstances of the parties justify or demand further or other liability."

Because of the peculiar significance of automobile liability insurance as well as the provisions of the policy contemplated by the parties and eventually issued, we do not agree with defendant's theory. We believe that these plaintiffs can sue defendant directly. The plaintiffs can be considered third party beneficiaries of the contract to procure insurance entered into between Jackson and defendant, that is, they had a suf-

ficient interest in such a contract to bring suit directly for its breach. In entering into this contract to procure insurance, it is a fair and reasonable inference that Jackson and his mother were contemplating possible injury to unidentified third parties, and the insurance coverage was for the direct benefit of third parties who might be injured through Jackson's negligence. Because Jackson, as the insured, was to be directly benefited by the insurance coverage, does not preclude the fact that others were also intended to be directly benefited.

The general public, subjected to possible injury through Jackson's negligent operation of a motor vehicle, possessed more than a mere "incidental" benefit from the contract to procure public liability insurance. It was, in effect, a real party in interest to this contract. The procuring of automobile public liability insurance of the type contemplated has connotations extending to the general public above and beyond the private interests of the two contracting parties. As was said by our Supreme Court in Simmon v. Iowa Mut. Cas. Co., 3 Ill2d 318, 322, 121 NE2d 509 (1954):

> "Automobile insurance has taken an important position in the modern world. *It is no longer a private contract merely between two parties.* The greater part of litigation in our trial courts is concerned with claims arising out of property damage, personal injury or death caused by operation of motor vehicles. The legislatures of all our States have recognized the hazards and perils daily encountered and as a result have enacted various pieces of legislation aimed at the protection of the injured party. Financial Responsibility acts, Unsatisfied Judgment Fund acts, and other similar laws are direct results of this concern. That the general welfare is promoted by

386

such laws can be little doubted. Government and the general public have an understandable interest in the problem. Many persons injured and disabled from automobile accidents would become public charges were it not for financial assistance received from the insurance companies." (Emphasis supplied.)

The fact that plaintiffs' identity may not have been known at the time the contract to procure insurance was made does not prevent them from assuming the status of third party beneficiaries. See generally: Selby v. Victoria Mines, 124 Mont 321, 221 P2d 423 (1950); Finkelberg v. Continental Cas. Co., 126 Wash 543, 219 P 12, 14 (1923); Slavens v. Standard Acc. Ins. Co. of Detroit, 27 F2d 859 (1928); Durband v. Nicholson, 205 Iowa 1264, 219 NW 318 (1928).

The plaintiffs' direct interest in this contract to procure insurance is buttressed by the policy contemplated by the parties, and eventually issued. It contained a specific provision inuring to the benefit of persons like the plaintiffs, giving them a right to recover directly against the insurance company: "Any person or organization or the legal representative thereof who has secured such judgment . . . shall thereafter be entitled to recover under this policy to the extent of the insurance afforded by this policy." If this policy were in effect at the time of the collision, the plaintiffs, judgment creditors, would have had a direct cause of action against the insurance company. Holding as we do, that the liability of defendant is to be determined by the terms of the contemplated policy, we see no reason to withhold from plaintiffs the right to recover directly from defendant to the same extent they could have recovered from the insurer if the contemplated policy had been timely issued.

387

For the reasons given, the judgments of the trial court are affirmed.

Affirmed.

KLUCZYNSKI, J., concurs.

BURMAN, P. J., dissenting:

The principal issue raised by this appeal is whether an insurance agent should be held liable on his contract to procure insurance to the same extent as an insurer on the basis of parole evidence as against the written documents exchanged between the parties.

From the documents involved in the transaction in question, it is clear that Ronald Jackson, the would-be insured, would not be covered by the automobile insurance policy for which he had paid $10 on account until a written binder or policy was issued and delivered. Language expressing such a condition was stamped both on the face of the receipt which Ronald received on December 11, 1956, when the first discussion took place, and again on the face of the letter which Ronald received several days later. The condition recited:

> The Insurance For Which You Have Applied For Which This Is A Payment On Account Is Not Effective Until A Written Binder Or Policy Is Issued And Delivered

Furthermore, it is clear from the letter which Ronald received that delivery of the policy was in turn conditioned upon payment of the full amount of the down payment of $35.40. The letter stated that:

> The down payment required was $35.40 towards which you have paid $10.00 leaving a balance which *must* be paid as follows:

388

By Dec. 31, 1956 $25.40

. . . . [W]hen the final payment has been made your policy will be mailed to you.

I believe that these provisions, when considered together, conditioned the agent's agreement to obtain effective insurance coverage for Ronald on delivery of the binder or policy, which in turn was conditioned on full payment of the $35.40 down payment.

I do not believe that any other language contained in these documents creates any ambiguity either about the effective date of the policy or about the nature of the agent's contract to procure insurance. The notation "12/11/56" which was written under the printed words "Date of Contract" on the receipt does not, in my opinion, indicate the effective date of the insurance policy; rather it indicates the date on which the payment on account was received and on which the contract to procure insurance was made. Other language in the letter welcoming Ronald to the "family of protected and satisfied policy holders," offering assistance if Ronald needed help with premium payment problems, and stating the date on which the insurance was "ordered," deals only indirectly and inferentially with the effective date of the policy. That language does not, in my opinion, create an ambiguity in the face of the language quoted above which directly and specifically states the conditions precedent to obtaining an effective policy.

In my opinion, the written documents clearly state that the remittance of the full down payment of $35.40 and delivery of a binder or a policy were conditions precedent to the agent's obligation under his contract to obtain an effective policy of insurance, and that this was understood and agreed to by the parties. Indeed, Ronald knew he was not covered by the insurance until he remitted the full amount because he claims

that he called the agent's office upon receipt of the letter to find out whether he was insured.

In the face of these unambiguous, written documents, I do not believe that the conversations between the parties concerning the effective date of the policy can be considered in order to establish a contract which is different from that which is unambiguously expressed in the written agreement. The object of construction of a contract is to ascertain the intention which the parties have expressed in the language of the contract, and where there is no ambiguity in the terms used, the instrument itself is the only criterion of the intent of the parties. Abingdon Bank & Trust Co. v. Bulkeley, 390 Ill 582, 62 NE2d 447; Lewis v. Real Estate Corp., 6 Ill App2d 240, 127 NE2d 272; Chicago Land Clearance Comm. v. Jones, 13 Ill App2d 554, 142 NE2d 800; Belanger v. Seay & Thomas, Inc., 28 Ill App2d 266, 171 NE2d 418.

It is uncontroverted that prior to the accident Ronald did not pay the full amount of the $35.40 down payment which accounts for the fact that he did not receive either a binder or a policy. Hence, under the clear terms of the agent's agreement to obtain insurance, the conditions precedent to his duties under the contract were not met and the agent should not be held liable as an insurer for an amount which, under the policy, could total as much as $20,000. I do not believe that the agent unconditionally accepted this large risk for a consideration of only $10; he agreed to obtain insurance coverage only on payment of $35.40, of which the $10 which Ronald remitted was only a payment on account. It appears that the agent was making every effort to obtain a policy for Ronald, an eighteen-year-old boy who the agent had turned down on a previous occasion because he did not meet the underwriting requisites. However, the agent agreed to obtain insurance for Ronald only on the explicit un-

derstanding that Ronald pay the full down payment and that he would have effective insurance coverage only upon receipt of a binder or policy. These conditions were unambiguously expressed in the written contract and subsequent parole evidence, particularly concerning Ronald's telephone conversation with an unidentified person in the agent's office, should not be heard to alter these clear conditions.

For these reasons, I would reverse the judgment of the trial court.