(No. 5471-

THOMAS M. MADDEN COMPANY, a Corporation, Claimant, vs. STATE OF ILLINOIS, Respondent.

*Opinion filed February 18, 1971.*

HEALY, McGURN AND O'BRIEN, Attorneys for Claimant.

WILLIAM J. SCOTT, Attorney General; BRUCE J. FINNE and SAUL R. WEXLER, Assistant Attorneys General, for Respondent.

DOVE, J.

This is a claim for the sum of $112,648.97 allegedly expended by claimant in connection with dumping approximately 920,000 cubic yards of excavated material at a dump site on the shores of Lake Calumet.

The claim is made specifically for equipment and labor used to level, grade and compact the dumped material.

It appears that the facts in this case are not disputed and are as follows:

On July 11, 1961, claimant, as the successful bidder, was awarded a contract by the State of Illinois, Department of Public Works and Buildings, Division of Highways, for the construction of a section of the Dan Ryan Expressway between 59th Street and 63rd Street in the City of Chicago. A major element in the performance of this contract consisted of the excavation and disposal of approximately one million cubic yards of earth from the construction site. The contract was fully performed and there appears to be no issue concerning said contract except for claimant's claim which arises under the Special Provisions of the Specifications relating to the disposal of the excavated material. The applicable provisions of the contract are as follows:

*"Disposal of Surplus Excavated Material:* All surplus excavated material shall be transported, deposited and compacted where necessary as hereinafter specified, in the areas described herein and in accordance with the applicable provisions of Section 16 of the Standard Specifications, except as otherwise specified herein or ordered by the Engineer.

Prior to placing any excavated materials in the areas hereinafter specified, the Contractor shall secure approval of the proposed embankment area involved. Surplus excavated material shall be all material from 'Special Excavation' and 'Class A Excavation for Structures' which is designated as surplus by the Engineer.

Surplus excavated material which the engineer designates as suitable for roadway embankment shall be transported, placed and compacted in the East Frontage Road embankment on the South Expressway (East Leg) between 107th Street and 127th Street before any material is placed in Sections 1, 2 and 3 designated herein.

Location plans and cross sections for the proposed embankment in this area will be furnished to the Contractor by the Department immediately after the award of the contract. This Contractor shall remove all unsatisfactory debris from within the limits of the proposed embankment area before placing any new embankment as and when directed by the Engineer. Such debris shall be stockpiled in locations designated by the Engineer. This embankment shall be placed and compacted in accordance with the applicable provisions of Section 16 of the Standard Specifications, unless specifically otherwise authorized by the Engineer.

This contract for the proposed East Frontage Road (Section 0912-707.1) Project I-90-5(73) (114) has been let and work should be in progress by the time this contract is awarded. Since work on the East Frontage Road will be under way, it is imperative that this Contractor place the necessary suitable surplus excavated material for the embankment for this road at the earliest possible date after the award of this project. Arrangements shall be made with the Engineer to excavate the required amount of material even though it may involve excavating in Stage I, areas designated to be removed in later stages in the Special Provisions titled 'Construction Procedure and Maintenance of Traffic'.

The Contractor shall dispose of the remainder of his *surplus* excavated material in the following approximate areas, all within the general limit of the Chicago Regional Port District at Lake Calumet.

Section 1. The extension of Stony Island Avenue from 112th Street to 122nd Street. This embankment area will be approximately 150 feet wide and will accommodate approximately 440,000 cubic yards of material.

Section 2. All remaining surplus excavated material shall be deposited in an area east of and parallel to the proposed East Frontage Road to be constructed under the previously mentioned contract. This embankment area will extend from 110th Street to 116th Street and will be approximatly 700 feet wide.

Section 3. All unsuitable material shall be disposed of in accordance with Article 14.8 of the Standard Specifications.

More detailed locations and cross sections for Sections 1 and 2 above will be furnished to the Contractor at the time he is ready to start his excavation operations. This Contractor will be required to merely transport and dump the surplus excavated materials in the locations described as Sections 1 and 2.

The hauling, placing and compacting, where specified, of surplus excavated material, the construction of any required cross roads and ramps and the removing and stockpiling of unsuitable debris, all as described above, will not be paid for separately, and the cost thereof shall be included in the contract unit prices bid for the excavation items involved."

Of the approximately one million cubic yards excavated by claimant during the performance of the contract, about 80,000 yards of excavated material was placed and compacted on the East Frontage Road embankment. About 920,000 cubic yards were removed to the dump site on the shores of Lake Calumet designated by the contract as the Section 2 Dumping Site. The problems encountered by claimant during the removal of the excavated material to the Section 2 Dumping Site gives rise to its claim.

The record in this case indicates that Robert J. Madden, Vice-President of claimant, made an inspection of the dumping sites prior to claimant submitting its bid. From his inspection of the dumping area, Mr. Madden knew that the great bulk of excavated material dumped at the Section 2 Dumping Site would actually be dumped into Lake Calumet and that bulldozers and workers would be required to spread and level the excavated material as it was dumped by the trucks at this particular site.

Claimant in preparing its bid made no effort to compute or to include the costs for the necessary leveling and spreading of excavated material at the Section 2 Dumping Site because claimant interpreted the contract phrase "to merely transport and dump" to mean that managing the dirt as the trucks dumped it at the Section 2

Dumping Site would be the obligation of some other party and that its sole obligation would be to dump the excavated material at the site. Claimant apparently did not inquire of either the State of Illinois or the Chicago Regional Port District as to whether its assumption that some other party or person would be responsible for managing the dirt was correct.

On August 14, 1961, dumping began at the Section 2 Dumping Site. That same day claimant discovered that four other contractors were also dumping in the same area and that none had been assigned specific locations. Claimant also discovered that no one from the Port District or the State of Illinois was managing the dirt and that claimant, like the other contractors, was going to have to provide its own equipment to level and move the excavated material.

On August 14, 1961, claimant made inquiry for the first time of the State of Illinois and the Port District as to who was going to level the dirt. The Port District had no plans to handle the material. The construction engineer for the State told Mr. Madden to write him a letter. The following day, August 15, 1961, claimant wrote to the District Engineer asking for reimbursement for the expenses being incurred. The State did not answer claimant's letter of August 15, and on September 19, 1961, he wrote the State of Illinois again. The fact that none of the contractors dumping in the Section 2 dumping area had any specific areas assigned to them in which to dump became a problem. Claimant demanded that there be a meeting of the contractors and the State so that dumping areas could be assigned. Such a meeting was held on September 21, 1961. Claimant was specifically assigned the area from 113th Street to 116th Street. With respect to claimant's demands for reimbursement for the costs being incurred daily in leveling and spreading the

excavated material, claimant never received any written response from the State of Illinois until March 8, 1962, at which time he was notified that the State of Illinois was rejecting his claim. The excavating work was finished in July or August of 1963.

Claimant continued to pursue its demands for reimbursement, and there is some indication in the record that in 1966 the Department of Public Works and Buildings was seriously considering a compromise payment to claimant in the amount of $89,564.94. It appears that the death of claimant's attorney was a factor in this settlement not being effected.

Claimant takes the position that there is no ambiguity in the contract and that the provision of the contract providing that claimant would be required to "merely transport and dump" the surplus excavated materials in the Section 2 Dumping Site means, on its face, that letting the dirt fall out of the truck was the extent of claimant's contractual obligation. Claimant also contends that if the contract is ambiguous, it should be construed against the respondent who prepared the contract. Respondent argued that since the dirt could not be dumped without leveling, other than in a vast open prairie, it was implied in the contract that claimant would do all leveling necessary to permit him to carry out his contractual obligations to dump.

The issue in this case is the meaning of the phrase "merely transport and dump". In connection with the meaning of the word "dump", the testimony of respondent's own witness, Henry M. Yamanaka, District Design Engineer, should be noted. He testified that the contract in question was prepared by a consulting firm and submitted to him for approval. He further testified, in answer to a question as to what was to be done with the excavated material that was dug up, that under the terms of

the contract the Contractor was merely to transport and dump the material at locations specified in the Lake Calumet area.

It is the opinion of this court that if the respondent intended for the Contractor to be responsible for leveling and compacting the excavated material at the Section 2 Dumping Site, that it should have so provided in the contract. The contract as written, stated that with respect to the Section 2 Dumping Site, the Contractor would be required to "merely transport and dump" the surplus excavated material. It should be noted that with respect to the East Frontage Road embankment area, the Contractor was specifically directed to transport, place and compact the excavated material. It would have been a simple matter for the respondent to draft the contract in such a way that the claimant would have been expressly advised of the fact that it was expected to not only transport and dump the excavated material at the Lake Calumet dumping site, but was also responsible for leveling and compacting the excavated material. For the foregoing reasons, and considering the well-established rule that if an instrument is ambiguous, it will be construed against the party who prepared it, *Donahue* vs. *Rockfort Showcase and Fixtures Company,* 87 Ill. App. 2d 47, 230 NE 2d 278; *Gothberg* vs. *Nemerovski,* 58 Ill. App. 2d 372, 208 NE 2d 12, and considering Mr. Yamanaka's testimony with respect to his interpretation of the contract and considering the evidence in the record that the Department of Public Works and Buildings, through certain of its employees, was considering authorizing a payment to claimant in the amount of $89,564.94, this court hereby makes an award to claimant in the amount of $89,564.94.