Lawrence T. JEFFERSON, Mary C. Jefferson, Appellants,

v.

ALASKA 100 INSURANCE, INC., an Alaska Corporation, Appellee.

No. S–984.

Supreme Court of Alaska.

April 11, 1986.

As Amended May 13, 1986.

Thomas A. Miller, Fairbanks, for appellants.

William B. Schendel, Schendel & Callahan, Fairbanks, for appellee.

Before RABINOWITZ, C.J., and BURKE, MATTHEWS, COMPTON and MOORE, JJ.

## OPINION

BURKE, Justice.

Lawrence Jefferson appeals from Judge James Blair's decision that Alaska 100 Insurance Company (Alaska 100) was entitled to the proceeds of a sale of property owned by Jefferson. Jefferson had secured a confession of judgment, executed by his joint venturer in favor of Alaska 100, with a

deed of trust to the property. In exchange, Alaska 100 was to procure workers' compensation insurance for Big Four Construction Company (Big Four). We conclude that since Alaska 100 fulfilled its obligations to Jefferson and Big Four, it was entitled to the sale proceeds.

## I. FACTS AND PROCEEDINGS BELOW

In July or August of 1981, Lawrence Jefferson began a joint venture with Paul Wilson (doing business as Big Four) to do three or four road construction projects for the State of Alaska (State). In order to hire employees to complete the project, the State required that Jefferson and Wilson show proof of workers' compensation coverage. Wilson and Jefferson went to Alaska 100 to apply for workers' compensation insurance.[1]

In early August 1981 they met with Rick Wagner, the president of Alaska 100. Wagner told Jefferson and Wilson that he would not write more insurance for Wilson "until [Wilson] cleared up his old bill" which had been turned over to an attorney for collection. On August 12, Jefferson and Wilson visited David Call, Alaska 100's attorney, where Wilson signed a Confession of Judgment attesting to the debt owed Alaska 100. Jefferson signed a Deed of Trust securing the Confession of Judgment.[2] Neither document mentions Alaska 100's obligation to Jefferson and Wilson. Jefferson and Wilson, however, both testified that they executed the documents to ensure that Wagner would procure workers' compensation insurance for them.

After signing the documents, Jefferson and Wilson filled out an application for workers' compensation insurance which Wagner signed as their agent. The application was sent on August 12 with a $766 payment to the Alaska Workers' Compensation Reinsurance Pool (Pool) for assignment to a carrier.

---

1. Wilson, d/b/a Big Four, had previously conducted all of its insurance business with Alaska 100.

2. Call drafted both the Deed of Trust and the Confession of Judgment. Wilson consulted his attorney before signing the Confession of Judgment. Jefferson did not consult an attorney.

On August 17, 1981, the Pool sent a letter to Alaska 100 designating Alaska Pacific as the carrier. Alaska Pacific required an additional payment before the coverage became effective because Big Four's officers had not waived coverage for themselves. Alaska 100 sent Alaska Pacific an additional $1890 to bind coverage.[3] On August 25, Alaska 100 received a telex from Alaska Pacific stating that coverage could not be bound for Big Four unless Big Four paid Alaska Pacific the $11,535 it owed from previous transactions.[4]

On the afternoon of August 25, Pat Hendershott, an Alaska 100 agent, informed Wilson of the lack of insurance coverage. She told him she would attempt to obtain another carrier. Hendershott contacted the Pool the next business day to have the policy assigned to another carrier. She was told that no new carrier would be assigned until the debt was paid. She then called the State's General Services Administration Office and advised them that the certificate of insurance issued for Big Four had to be revised because there was no workers' compensation insurance. Alaska Pacific returned the $2656 premium to Alaska 100.

The Alaska 100 files for Big Four indicate that Hendershott diligently attempted to obtain coverage for Big Four. On September 9, she attempted to obtain coverage from Providence Washington. It appeared willing to consider writing the policy if Alaska 100 could assure it that Big Four would pay its premiums in advance. Hendershott attempted to contact Wilson and Big Four, left messages on a recording machine, and even gave a personal message to Wilson's son, Bobby, when he was in Alaska 100's office. On October 2, Hendershott referred the file and Big Four's insurance problems to Wagner after failing to get in touch with Wilson.

Alaska 100's financial problems with Jefferson and Big Four continued. An Alaska 100 internal memo, dated November 16, indicates that Big Four was not paying the amount agreed to in the Confession of Judgment payments schedule. Wilson admitted that he defaulted on the payment plan. Additionally, a $60 (or $66) check Jefferson wrote in early August for Bobby Wilson's separate workers' compensation insurance bounced.

The lack of insurance altered the Big Four/Jefferson joint venture. Since they could not employ workers without workers' compensation insurance, Jefferson and Wilson did the road project work themselves.

In the spring of 1984, Jefferson attempted to sell the property which had been the subject of the deed. The deed of trust showed up on the title report. Jefferson contacted attorney Call by phone and letter. Jefferson told Call that the deed should have been "null and void." Call told him it would be taken care of and wrote a short letter to Wagner requesting that Wagner sign a full reconveyance. Wagner refused to reconvey. Call subsequently wrote Lyle Carlson, Jefferson's attorney, to explain why the deed would not be reconveyed. Essentially, Alaska 100 and Wagner refused to reconvey because they believed that, in consideration for the Confession of Judgment and Deed of Trust, they had agreed only to "process" Big Four's application and had fulfilled their obligation.

The proceeds from the sale of the property ($29,488.72) were sent to Call and made payable to Alaska 100. Call then filed an interpleader action requesting that the court determine the proper recipient of the money.

---

3. Insurance is generally bound from the date effective on the application until the official policy is issued or the application rejected. *See generally* 43 Am.Jur.2d § 219 (1982). "A binder is an insurer's bare acknowledgement of its contract to protect the insured against casualty until a formal policy can be issued. The binder may be oral or written. No specific form is required nor does it have to set forth all the terms of the insurance contract." *Hursh Agency, Inc. v. Wigwam Homes, Inc.,* 664 P.2d 27, 34 n. 5 (Wyo.1983).

4. Wilson was aware of the debt Big Four owed Alaska Pacific.

After trial the court determined that Alaska 100 was entitled to the proceeds from the sale of the property because the "Deed of Trust was supported by adequate consideration" and because "Alaska 100 Insurance fully performed its obligation under the Jeffersons' understanding of their agreement with Alaska 100."[5] The court also granted Alaska 100 costs and reasonable attorney's fees.

The trial court believed that the temporary coverage provided between the receipt of the deposit and the rejection of binding coverage fulfilled Alaska 100's obligations to obtain coverage. It specifically stated:

> It is unnecessary to determine whether Alaska 100 agreed to actually provide worker's compensation coverage, as maintained by Mr. Jefferson, or whether Alaska 100 agreed to use its best efforts to attempt to provide worker's compensation coverage for Big Four, as maintained by Alaska 100, because Alaska 100 actually provided worker's compensation coverage for Big Four from 12:01 am on August 13, 1981 through August 25, 1981 when coverage was cancelled because Big Four had failed to satisfy a $11,535 debt to ALPAC [Alaska Pacific].

The court stated further that since Alaska 100 or Alaska Pacific would have been liable for coverage during the period from August 13–25, then Alaska 100 was entitled to the benefits of the agreement.

We affirm the trial court's finding that Alaska 100 is entitled to the property sale proceeds. We do not, however, adopt its reasoning.[6] Alaska 100 was only obligated to use its best efforts to procure insurance for Jefferson, Wilson and Big Four.

## II. DISCUSSION

Although Jefferson maintains that Big Four and Alaska 100 never reached an agreement, the trial court found that an agreement existed whereby Alaska 100 would procure workers' compensation insurance for Big Four in exchange for security on Big Four's prior debt. The trial court had the opportunity to assess the testimony and evidence presented. We will neither reweigh evidence presented to the trial court nor substitute our judgment for that of the trial court. *Martens v. Metzgar*, 591 P.2d 541, 544 (Alaska 1979). We will not disturb the findings of the trial court unless we are left with a definite and firm conviction on the entire record that a mistake has been made. *Id.* No such mistake was made here. Jefferson and Wilson met with Alaska 100 to procure workers' compensation insurance. Wilson had previously done business with Alaska 100. He undoubtedly knew the procedure for obtaining insurance. The application itself was made to the Pool, not to Alaska 100.

The key issue here is Alaska 100's obligations under its agreement to procure insurance for Big Four. An agent or broker is liable to an insured if, by the agent's fault, insurance is not procured as promised and the insured suffers a loss. *Todd v. Malafronte*, 3 Conn.App. 16, 484 A.2d 463, 467–68 (1984); *Nahmias Realty, Inc. v. Cohen*, 484 N.E.2d 617, 620–21 (Ind.App. 1985); *Hursh Agency, Inc. v. Wigwam Homes, Inc.*, 664 P.2d 27, 32 (Wyo.1983); 3 R. Anderson, *Couch Cyclopedia of Insurance Law* § 25:46 (Rev.2d ed. 1984) (hereinafter cited as Couch); B. Harnett, *Responsibilities of Insurance Agents and Brokers* § 3.03 (1985 ed.). The agent must use "reasonable care, skill, and diligence in procuring the insurance." *Eagle Air, Inc. v. Corroon and Black/Dawson and Co.*, 648 P.2d 1000, 1006 (Alaska 1982); *see Todd*, 484 A.2d at 467; *Nahmias Realty*, 484 N.E.2d at 620–21; *United Farm Bureau Mutual Insurance Co. v. Cook*, 463 N.E.2d 522, 527 (Ind.App.1984); *see also* Harnett, *supra*, § 3.03 at 3–9. Absent an agent's

---

**5.** Both Jefferson and his wife executed the Deed of Trust and were parties to this action.

**6.** We may affirm a judgment of the superior court on grounds different from those addressed by that court. *Sisters of Providence in* *Washington v. Municipality of Anchorage*, 672 P.2d 446, 448 n. 2 (Alaska 1983). *See Kennecorp Mortgage & Equities v. First National Bank of Fairbanks*, 685 P.2d 1232, 1237 n. 3 (Alaska 1984).

commitment to use more than reasonable efforts, or conduct that misleads the "insured" to the insureds' detriment, an agent need only use reasonable efforts to procure insurance.[7] *See* Harnett *supra,* text at n. 3.

■ Fairness mandates that an agent only be required to use best efforts to procure insurance. Agents are generally only intermediaries between the insured and the insurance carriers. Since the agent cannot actually insure, he or she should not be required to provide such coverage where the coverage has been denied for a reason beyond the agent's control.

■ Moreover, the agent's duty to use reasonable diligence to procure insurance is coupled with an equally important duty to inform the insured of cancellation. Such prompt notification assures the insured the opportunity to make other arrangements to protect against subsequent losses. *United Farm,* 463 N.E.2d at 527; Couch, *supra,* § 25:47.

■ Jefferson and Wilson approached Alaska 100 to obtain insurance to satisfy the state requirement for their construction project. Alaska 100, through its president Wagner, refused to conduct any business with Big Four until a $22,000 debt was at least secured. By securing its prior debt, Big Four merely placed itself in a position to do business with Alaska 100. Alaska 100 was not an insurance carrier. The record evinces Alaska 100's diligent efforts to obtain workers' compensation insurance for Big Four despite the latter's previous poor payment record. Alaska 100 promptly notified Big Four of its inability to secure insurance coverage. Alaska 100 did all that was required under its duty as an agent for Jefferson, Wilson and Big Four.

■ Jefferson asserts that he did not know of the $11,000 debt to Alaska Pacific, hence he should not lose title to his property. Given Big Four's financial situation[8] and the outstanding $22,000 debt owed Alaska 100, Jefferson should have checked on the financial status of Big Four before securing the Confession of Judgment with his property.[9] He testified that he knew nothing about Big Four's business. Alaska 100 contends that Jefferson should be charged with knowledge of the prior debt as a partner of Wilson, who knew of the debt. AS 32.05.070.[10] We agree.

We, therefore, AFFIRM the trial court's judgment in favor of Alaska 100, including its award of costs and attorneys fees.

---

7. The Arizona Court of Appeals indicates in dicta that an agent may be absolutely liable to an applicant on an unconditional promise to procure insurance. *Oney v. Barnes,* 5 Ariz.App. 460, 428 P.2d 124, 126–27 (1967) (finding, however, a conditional promise). The Arizona court's dicta cited *Gothberg v. Nemerovski,* 58 Ill.App.2d 372, 208 N.E.2d 12, 19 (1965) for its "unconditional promise" discussion. In *Gothberg,* the Illinois court stated that it was implying an unconditional promise to insure. *Id.* However, *Gothberg's* discussion focuses on the agent's repeated assurances to the applicant that coverage was effective. *Id.* Thus, *Gothberg* more properly represents not an unconditional promise to procure but rather conduct that misled the applicant to the applicant's detriment.

8. Jefferson entered the agreement with Wilson for the state projects at least partially because of Wilson's poor financial status. Jefferson's contribution was to provide bonding for the venture.

9. Despite Jefferson's twenty years in the construction business, he did not even read the Confession of Judgment signed by Wilson and secured by his property. He had, however, executed deeds of trust on numerous occasions in the past.

10. AS 32.05.070 provides:
   Notice to a partner of any matter relating to partnership affairs ... operate[s] as notice to or knowledge of the partnership.