638 A.2d 1288

CARTER LINCOLN–MERCURY, INC., LEASING DIVISION, PLAINTIFF–RESPONDENT, v. EMAR GROUP, INC., DEFENDANT–APPELLANT, AND ALL POINTS, INC., A/K/A GOLDSTAR EXPRESS AND ELLIOTT H. GOLDSTEIN, DEFENDANTS.

Argued October 25, 1993—Decided April 12, 1994.

184

*Jeffrey M. Garrod* argued the cause for appellant (*Orloff, Lowenbach, Stifelman & Siegel,* attorneys; *Mr. Garrod* and *David B. Katz,* of counsel and on the brief).

*William G. Wright* argued the cause for respondent (*Farr, Lyons, Burke, Gambacorta & Wright,* attorneys).

The opinion of the Court was delivered by

STEIN, J.

The question presented is whether an insurance broker engaged to obtain insurance on behalf of a prospective insured owes a duty to a loss-payee subsequently named on the acquired policy to place the insurance with a financially stable insurance carrier.

EMAR Group, Inc. ("EMAR"), an insurance broker and agent, placed a collision policy with American Lloyds Insurance Company ("American Lloyds") on behalf of EMAR's client, All Points, Inc., also known as Goldstar Express ("All Points"), a commercial trucking company. The policy provided physical-damage insurance for all vehicles operated by All Points. Carter Lincoln–Mercury, Inc. ("Carter Lincoln") was the owner-lessor of one of

the vehicles insured under the policy and was named on a certificate of insurance as a loss-payee. The truck owned by Carter Lincoln was subsequently damaged in an accident. Carter Lincoln filed a claim with American Lloyds and discovered that the carrier was being liquidated and the claim would not be paid.

Carter Lincoln brought this action against EMAR, alleging that the broker had breached a duty to it by failing to exercise due care in placing the insurance policy, resulting in the selection of a financially unstable carrier that had not been authorized to issue policies in New Jersey and that subsequently became insolvent. EMAR moved for summary judgment, claiming it owed no duty to Carter Lincoln. The trial court determined that no duty existed as a matter of law and granted the motion. The Appellate Division reversed, holding that EMAR owed a duty to Carter Lincoln, as a foreseeable potential beneficiary of the policy, to "select[ ] a financially secure insurer." 261 *N.J.Super.* 245, 250, 618 *A.*2d 870 (1993).

We granted EMAR's petition for certification, 133 *N.J.* 443, 627 *A.*2d 1147 (1993), and now affirm the judgment of the Appellate Division.

I

The facts are essentially undisputed. The vehicle owned by plaintiff, Carter Lincoln, a 1985 diesel tractor, had been leased to All Points in February 1986 for a term of thirty-six months. The lease agreement required All Points to maintain collision insurance on the vehicle in an amount sufficient to protect Carter Lincoln's interest, and also obligated All Points to pay for accident-related repairs not covered by insurance. The agreement further required that the insurance be placed with a company approved by both Carter Lincoln and All Points.

All Points engaged defendant EMAR, a licensed insurance broker and agent, to obtain physical-damage insurance for its fleet of trucks. On December 16, 1988, EMAR placed a collision policy with American Lloyds of Metairie, Louisiana, through the insur-

ance carrier's New Jersey agent, Marketing Insurance Agency, to protect All Points' vehicles for the period from December 17, 1988, to December 17, 1989. All Points' previous policy had been canceled on two occasions for nonpayment of premiums, but each time had been reinstated when payment was made. That policy was again canceled, effective December 17, 1988, "for underwriting reasons." After EMAR placed the new policy with American Lloyds, All Points directed EMAR to list as loss-payees under the policy a number of finance companies and lessors, including Carter Lincoln. In January 1989, All Points sent a follow-up letter to EMAR, along with a chart listing the lessors and finance companies that were to be designated loss-payees and the vehicles in which they had an interest.

In February 1989, EMAR sent to All Points an insurance policy issued by American Lloyds, which included an endorsement, effective December 17, 1988, listing Carter Lincoln and other interested parties as loss-payees. EMAR also forwarded to Carter Lincoln a certificate of insurance dated February 16, 1989, designating All Points as the insured party for the truck and specifying Carter Lincoln as the certificate holder and loss-payee.

On February 17, 1989, the Carter Lincoln truck was damaged in a traffic accident in New Mexico. Carter Lincoln filed a claim with American Lloyds and made repeated demands for payment, but never received compensation. Carter Lincoln paid $22,919.21 to Quality Trucks of El Paso, Texas for repairs to the truck. In June 1989, American Lloyds was determined to be insolvent by a Louisiana state court and ordered to be liquidated under the supervision of the Louisiana Commissioner of Insurance. The deputy liquidator of American Lloyds subsequently notified Carter Lincoln that no funds were available to pay its claim.

Carter Lincoln instituted this action in May 1989 against All Points and its president, Elliot H. Goldstein, seeking recovery for damage to the truck not covered by insurance and for missed lease payments. Carter Lincoln later amended its complaint to assert a claim against All Points and Goldstein for failure to secure ade-

quate insurance coverage and to add EMAR as a defendant. Carter Lincoln claimed that EMAR had breached a duty owed to it by failing to exercise diligence and reasonable care in selecting an insurance carrier. The complaint alleged that at the time EMAR had placed the insurance policy, American Lloyds was not authorized to conduct business in New Jersey; was not rated by A.M. Best Company or listed in *Best's Insurance Reports*, an industry source of information on insurance companies; and had been under the conservatorship of the Louisiana Commissioner of Insurance since August 1988.

The trial court struck All Points' and Goldstein's answers to the complaint for failure to respond to interrogatories and subsequently entered a default judgment against both parties. EMAR answered the complaint and, after discovery, moved for summary judgment on the grounds that it owed no duty to Carter Lincoln as a matter of law and that no evidence established that it had acted negligently. Carter Lincoln cross-moved for summary judgment. The trial court found that EMAR had owed no duty to Carter Lincoln, citing the lack of privity between the parties and relying on this Court's decision in *Wang v. Allstate Insurance Co.*, 125 *N.J.* 2, 592 *A.*2d 527 (1991). The court granted EMAR's motion for summary judgment, denying Carter Lincoln's motion.

The Appellate Division reversed, relying substantially on *Impex Agricultural Commodities Division v. Parness Trucking Corp.*, 576 *F.Supp.* 587 (D.N.J.1983), to support its conclusion that defendant EMAR had owed a duty to Carter Lincoln to select a financially secure insurance company when it placed the policy.

We consider two related issues: (1) does an insurance broker have a duty to select a financially secure insurer when acting on behalf of an insured, and (2) if so, to whom is that duty owed?

## II

### A

An insurance broker acts on behalf of a prospective insured to procure insurance coverage. The common law has long recog-

nized that an insurance broker owes a duty to the insured to act with reasonable skill and diligence in performing the services of a broker. *Rider v. Lynch,* 42 *N.J.* 465, 476, 201 *A.*2d 561 (1964); *Milliken v. Woodward,* 64 *N.J.L.* 444, 448, 45 *A.* 796 (Sup.Ct.1900). In *Rider, supra,* we observed:

> One who holds himself out to the public as an insurance broker is required to have the degree of skill and knowledge requisite to the calling. When engaged by a member of the public to obtain insurance, the law holds him to the exercise of good faith and reasonable skill, care and diligence in the execution of the commission. * * * If he neglects to procure the insurance or if the policy is void or materially deficient or does not provide the coverage he undertook to supply, because of his failure to exercise the requisite skill or diligence, he becomes liable to his principal for the loss sustained thereby.
>
> [42 *N.J.* at 476, 201 *A.*2d 561.]

At common law both agents and brokers, when acting on behalf of an insured, owe the insured a duty of due care. *Weinisch v. Sawyer,* 123 *N.J.* 333, 340, 587 *A.*2d 615 (1991); *Avery v. Arthur E. Armitage Agency,* 242 *N.J.Super.* 293, 299, 576 *A.*2d 907 (App.Div.1990); *Sobotor v. Prudential Property & Casualty Ins. Co.,* 200 *N.J.Super.* 333, 337 n. 1, 491 *A.*2d 737 (App.Div.1984). Courts addressing the existence and scope of the duty owed by one acting on behalf of an insured or prospective insured have determined that that duty encompasses claims alleging that the agent or broker: failed to obtain coverage after the client's policy had been canceled and that the agent failed to inform the client that coverage could not be obtained, *DiMarino v. Wishkin,* 195 *N.J.Super.* 390, 393, 479 *A.*2d 444 (App.Div.1984); failed to advise a client of insurance options, *Weinisch, supra,* 123 *N.J.* at 340, 587 *A.*2d 615, and *Sobotor, supra,* 200 *N.J.Super.* at 339, 491 *A.*2d 737; obtained insurance that failed to meet the insured's needs, *Rider, supra,* 42 *N.J.* at 481–82, 201 *A.*2d 561; failed to place the requested insurance, *Eschle v. Eastern Freight Ways, Inc.,* 128 *N.J.Super.* 299, 319 *A.*2d 786 (Law Div.1974); misrepresented to the insurance company information supplied by the insured, *Milliken, supra,* 64 *N.J.L.* at 448–49, 45 *A.* 796; failed to take action after discovering during an inspection that the insured's sprinkler

system was inoperative, *Industrial Dev. Assocs. v. F.T.P., Inc.,* 248 *N.J.Super.* 468, 591 *A.*2d 682 (App.Div.), *certif. denied,* 127 *N.J.* 547, 606 *A.*2d 362 (1991); failed to inform the insured that she was without insurance, *Auger v. Gionti Agency,* 218 *N.J.Super.* 360, 366–67, 527 *A.*2d 928 (App.Div.), *certif. granted,* 109 *N.J.* 504, 537 *A.*2d 1293 (1987), *appeal dismissed,* 113 *N.J.* 348, 550 *A.*2d 459 (1988); and failed to inform the insured of the availability of immediate insurance coverage through a temporary binder, *Bates v. Gambino,* 72 *N.J.* 219, 222–25, 370 *A.*2d 10 (1977). Although the relationship of broker to insured may be described as contractual, our cases have recognized that the insured "does not sue on a contract of insurance." *Rider, supra,* 42 *N.J.* at 477, 201 *A.*2d 561. The claim asserted is based on the broker's negligent failure to procure the appropriate coverage. *Ibid.*

The duty of a broker or agent, however, is not unlimited. In *Wang, supra,* 125 *N.J.* at 11–12, 592 *A.*2d 527, we held that an insurance agent had no duty to advise an insured to consider higher amounts of homeowner's insurance. We found significant the absence of evidence of a relationship of reliance between the insureds and the agent in that case, noting that the facts suggested "that the policies had been routinely renewed, probably without any contact between the parties * * *." *Id.* at 16, 592 *A.*2d 527. In addition, we noted the absence of a statutory mandate to inform homeowners of the availability of greater coverage and the difficulty of fixing the limits of the asserted duty. Thus, we determined that the obligation to inform homeowners renewing their policies to consider higher liability limits was not encompassed by the recognized duty of care owed by agents to their insureds and, therefore, should be imposed, if at all, by the Legislature. *Id.* at 18–19, 592 *A.*2d 527. In *Cox v. Santoro,* 98 *N.J.Super.* 360, 365–66, 237 *A.*2d 491 (1967), the Appellate Division declined to impose on an insurance broker a duty to inform an insured who had worked in the insurance business for forty years that the policy he had received did not cover his son while driving a relative's car. *See also Bruce v. James P. MacLean Firm,* 238

*N.J.Super.* 501, 508–09, 570 *A.*2d 49 (Law Div.) (holding agent has no affirmative duty to explain notice of availability of additional uninsured-motorist coverage that statute required insurer to mail), *aff'd,* 238 *N.J.Super.* 408, 570 *A.*2d 1 (App.Div.1989); *Citta v. Camden Fire Ins. Ass'n,* 152 *N.J.Super.* 76, 377 *A.*2d 779 (App. Div.1977) (holding that agent had no duty to give notice to insured of expiration of policy, although broker may have such duty).

■ Whether a broker's duty includes placing the insurance with a financially secure carrier is a question of first impression in this state. Courts in other states have recognized, however, that an insurance broker has an obligation to investigate the financial soundness of the insurance carrier with which the broker places insurance and to refrain from placing insurance with a carrier that the broker knows to be insolvent. See, *e.g., Williams–Berryman, Ins. Co. v. Morphis,* 249 *Ark.* 786, 461 *S.W.*2d 577, 580 (1971) (holding that insurance broker must use "reasonable care, skill, and judgment with a view to the security or indemnity for which the insurance was sought"); *Nidiffer v. Clinchfield R.R.,* 600 *S.W.*2d 242, 246 (Tenn.Ct.App.1980) (holding that employer who undertakes to procure insurance for employees must use reasonable care to select solvent carrier); *Higginbotham & Assocs. v. Greer,* 738 *S.W.*2d 45, 47 (Tex.Ct.App.1987) (holding that agent may be liable for insured's lost claim due to carrier's insolvency if at time of procurement or at later time when insured could be protected agent knows or by exercise of reasonable diligence should know insurer presents unreasonable risk); *Sternoff Metals Corp. v. Vertecs Corp.,* 39 *Wash.App.* 333, 693 *P.*2d 175, 180 (1984) (stating that "insurance broker has a common law duty to his insured not to negligently place insurance in a company [that] he knows or should know is presently insolvent"). *But see Wilson v. All Serv. Ins. Corp.,* 91 *Cal.App.*3d 793, 153 *Cal.Rptr.* 121 (1979) (holding that broker has no duty to investigate financial condition of insurer authorized to do business in state because duty already imposed on Insurance Commissioner).

Various commentators have also recognized the obligation of an insurance broker to investigate the financial security of an insurance carrier. See, *e.g.*, 16A John A. Appleman & Jean Appleman, *Insurance Law and Practice* § 8842, at 220–21 (rev. ed. 1981) (hereinafter Appleman) (stating that agent or broker is required to use reasonable care, skill, and judgment with view to security or indemnity for which policy is sought, and failure to do so may result in liability to insured for losses due to insolvency of insurer); 3 Mark S. Rhodes, *Couch on Insurance 2d* § 25:32, at 328 (stating that broker must exercise reasonable skill and diligence in selecting insurer and ascertaining that insurer is "of good credit and standing"), §· 25.48 at 375 ("Ordinarily, an agent to procure a policy is liable where he places a risk in a company which is insolvent if the use of proper diligence would have revealed that fact before the insurance was procured * * *.") (rev. ed. 1984); 2 J.D. Lee & Barry A. Lindahl, *Modern Tort Law* § 26.34, at 529 (rev. ed. 1989) ("The agent [or broker] must obtain the requested coverage * * * from a functioning company that the agent reasonably believes to be solvent." (footnotes omitted)).

> The general rule is that an insurance agent or broker is not a guarantor of the financial condition or solvency of the company from which he obtains the insurance. However, he is required to use reasonable care, skill, and judgment with a view to the security or indemnity for which the insurance is sought, and a failure in such respect may render him liable to the insured for resulting losses due to the insolvency of the insurer. Consequently, where a policy is procured in a company which is known by the agent to be insolvent, the agent is liable for a loss suffered thereby, while on the other hand, where the company was solvent when the policy was procured, the subsequent insolvency of the company does not impose liability on the agent or broker.
>
> [43 *Am.Jur.2d, Insurance* § 143, at 228 (1982) (footnotes omitted).]

See *Carter Lincoln, supra,* 261 *N.J.Super.* at 250, 618 *A.*2d 870 (relying on "well-recognized general rule" and quoting 43 *Am.Jur. 2d, supra, Insurance* § 143, at 228); *Williams–Berryman, supra,* 249 *Ark.* 786, 461 *S.W.*2d at 580 (same).

Several statutory provisions address the financial soundness of insurance companies. To be authorized to do business in New Jersey, insurers incorporated in New Jersey must have set

amounts of unimpaired capital and surplus, *N.J.S.A.* 17:17–6, and must deposit securities, such as government bonds or certificates of deposit, with the Commissioner of Insurance, *N.J.S.A.* 17:20–1c. "The deposits shall be held for the benefit and security of all the policyholders of the company depositing them." *Ibid.; see also N.J.S.A.* 17B:18–35 to –40 (requiring life and health insurers to have set amounts of capital stock and to deposit securities with Commissioner of Insurance). Foreign insurers are also subject to capital and deposit requirements before they may be admitted to do business in New Jersey. *N.J.S.A.* 17:32–1, –5.

*N.J.S.A.* 17:17–12 makes unlawful the conducting of insurance business in the state by unauthorized carriers, and *N.J.S.A.* 17:22–6.37 makes unlawful the aiding in the procurement of a contract of insurance for any unauthorized insurer by brokers and agents. Coverage, however, may be placed with unauthorized insurers if it is not procurable, after a diligent effort has been made, from authorized insurers. *N.J.S.A.* 17:22–6.42. But those unauthorized insurers must first be declared eligible surplus-lines insurers by the Commissioner of Insurance after an examination of the insurer's financial statements, management, and history in the business. See *N.J.S.A.* 17:22–6.45. (The record before us is silent concerning whether the coverage in question could not have been procured from authorized insurers, whether American Lloyds had been declared an eligible surplus-lines insurer and, if so, whether the policy had been placed by EMAR through an authorized surplus-lines agent. See *N.J.S.A.* 17:22–6.42 to –6.43, 17:22–6.45, 17:22–6.41.) Further concern for insureds who rely on the financial stability of insurance companies is reflected by the existence of the Property–Liability Insurance Guaranty Association, which provides protection to insureds whose risks are covered by authorized insurers that later become insolvent. See *N.J.S.A.* 17:30A–1 to –20. In addition, the New Jersey Surplus Lines Insurance Guaranty Fund Act provides protection to insureds that have policies with *eligible*, nonadmitted surplus-lines insurers that become insolvent. See *N.J.S.A.* 17:22–6.70 to –6.83.

Although our cases have not heretofore addressed a broker's liability for placement of a policy with an insolvent carrier, the Appellate Division has held that a broker who negligently places a policy with an insurance carrier not authorized to issue policies in New Jersey may be liable for damages suffered by the claimant. In *Gerald v. Universal Agency, Inc.*, 56 *N.J.Super.* 362, 153 *A.*2d 359 (1959), the court held that an insurance broker who places insurance with an unauthorized carrier that subsequently refuses to pay a legitimate claim may be liable for the plaintiff's damages unless the broker can demonstrate its unsuccessful but diligent effort to procure insurance from authorized insurers and has informed the insured that the policy obtained is written by a carrier not authorized to do business in New Jersey. *Id.* at 371, 153 *A.*2d 359.

### B

"The question of whether a duty exists is a matter of law properly decided by the court, not the jury * * *." *Wang, supra,* 125 *N.J.* at 15, 592 *A.*2d 527. The question is one of fairness and policy that "involves identifying, weighing, and balancing several factors—the relationship of the parties, the nature of the attendant risk, the opportunity and ability to exercise care, and the public interest in the proposed solution." *Hopkins v. Fox & Lazo Realtors,* 132 *N.J.* 426, 439, 625 *A.*2d 1110 (1993) (citing *Goldberg v. Housing Auth.,* 38 *N.J.* 578, 583, 186 *A.*2d 291 (1962)).

Ability to foresee injury to a potential plaintiff does not in itself establish the existence of a duty, *see Goldberg, supra,* 38 *N.J.* at 583, 186 *A.*2d 291, but it is a crucial element in determining whether imposition of a duty on an alleged tortfeasor is appropriate. *See Hill v. Yaskin,* 75 *N.J.* 139, 143–44, 380 *A.*2d 1107 (1977) (discussing "foreseeability as a 'duty' determinant"). Subsumed in the concept of foreseeability are many of the concerns we acknowledge as relevant to the imposition of a duty: the relationship between the plaintiff and the tortfeasor, the nature of the risk, and the ability and opportunity to exercise care. Once the foreseeabil-

ity of an injured party is established, we must decide whether considerations of fairness and policy warrant the imposition of a duty. *See Weinberg v. Dinger,* 106 *N.J.* 469, 485, 524 *A.*2d 366 (1987) ("Whereas the magnitude and likelihood of potential harm are objectively determinable, the propriety of imposing a duty of care is not."); *Kelly v. Gwinnell,* 96 *N.J.* 538, 544, 476 *A.*2d 1219 (1984) (stating that action creating unreasonable risk of foreseeable harm resulting in injury is not enough to sustain negligence cause of action; court must also make value judgment based on analysis of public policy that actor owed injured party duty of reasonable care (citing *Palsgraf v. Long Island R.R.,* 248 *N.Y.* 339, 162 *N.E.* 99 (1928))).

In *People Express Airlines v. Consolidated Rail,* 100 *N.J.* 246, 495 *A.*2d 107 (1985), we held that a plaintiff could bring an action for purely economic losses, regardless of any accompanying physical harm or property damage, if the plaintiff was a member of an identifiable class that the defendant should have reasonably foreseen was likely to be injured by the defendant's conduct and the plaintiff's injuries had been proximately caused by the defendant's negligence. *Id.* at 263, 495 *A.*2d 107. We found it appropriate to impose a duty on tortfeasors who by virtue of their activities, training, or preparation for their work had particular knowledge or reason to know that others would be harmed by their negligent conduct, *id.* at 258, 495 *A.*2d 107, and we stated that "the more particular is the foreseeability that economic loss will be suffered by the plaintiff as a result of defendant's negligence, the more just is it that liability be imposed and recovery allowed." *Id.* at 263, 495 *A.*2d 107.

In addressing the imposition of a duty based on principles of foreseeability, that a plaintiff may be found within the "range of harm" emanating from a tortfeasor's activities is more significant than whether the parties stand in a direct contractual relationship. *See* W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 92, at 655 (5th ed. 1984) ("The obligations [that] give rise to tort actions * * * are created primarily on the basis of policy

reasons of one kind or another apart from enforcing a commitment of an intention to do or not to do something in the future."). A number of our cases have recognized that lack of privity between the plaintiff and the alleged tortfeasor is no bar to recovery based on negligence. See, *e.g., Aronsohn v. Mandara,* 98 *N.J.* 92, 105, 484 *A.*2d 675 (1984) (stating that contractor has duty to carry out work in careful and prudent manner and may be liable to third persons for injuries and property damages caused by negligence irrespective of privity); *H. Rosenblum, Inc. v. Adler,* 93 *N.J.* 324, 338–39, 461 *A.*2d 138 (1983) (holding auditor may be liable to plaintiff stockholders for negligent misrepresentation and observing that privity should not be condition of recovery but that reasonable foreseeable consequences of negligent act define duty); *Essex v. New Jersey Bell Tel. Co.,* 166 *N.J.Super.* 124, 129, 399 *A.*2d 300 (App.Div.1979) (holding that defendant utility owed duty to exercise reasonable care in installation of telephones to avoid injury to all within zone of hazard created by its activity).

The principle that duty is defined not by the contractual relationship between the parties but by considerations of foreseeability and fairness is equally applicable in the insurance context. Thus, our cases have held that an insurance broker or agent owes a duty of care not only to the insured with whom the broker contracts but also to other foreseeable parties injured by the broker's or agent's negligence. For example, in *Rider, supra,* 42 *N.J.* 465, 201 *A.*2d 561, a young woman with a learner's permit who could drive only if accompanied by a licensed driver retained an insurance broker to procure insurance. The broker informed her that he would obtain insurance for the car, which was owned by her fiance but had been furnished for her use. *Id.* at 471, 201 *A.*2d 561. Subsequently, the woman's father, while driving the car alone, was involved in an accident in which the other driver was killed. He sued the broker for negligence after discovering that the broker had procured insurance that did not provide him or his daughter with any liability coverage. We found that the facts suggested "that a broker exercising due care would have under-

stood he was committing himself to obtain coverage for the daughter which would cover the father when he was using the car." *Id.* at 482, 201 *A.*2d 561. Thus, we held that the father had presented enough evidence to survive a motion to dismiss and could proceed with an action in negligence against the broker. *Id.* at 483, 201 *A.*2d 561.

In *Eschle, supra,* 128 *N.J.Super.* 299, 319 *A.*2d 786, the trial court declined to dismiss an action brought by a passenger of an uninsured driver against an insurance agent who had been engaged to obtain liability coverage on the automobile but had failed to do so. The passenger claimed that the agent was liable to her for negligently failing to procure the insurance requested by the insured. The court framed the question as whether a "duty [was] owed by the insurance agent to members of the public, which duty is breached by the failure to obtain requested coverage." *Id.* at 302, 319 *A.*2d 786. The court concluded that the lack of coverage for an injured passenger is a foreseeable consequence of an agent's negligent failure to obtain coverage, for which the agent can be held liable. *Id.* at 304, 319 *A.*2d 786; *see also Werrmann v. Aratusa, Ltd.,* 266 *N.J.Super.* 471, 475, 630 *A.*2d 302 (App.Div. 1993) (holding that agent may be liable to restaurant patron as "foreseeable" injured party left without means of redress due to negligence of agent in failing to renew restaurant's liability policy); *Walker v. Atlantic Chrysler Plymouth, Inc.,* 216 *N.J.Super.* 255, 262, 523 *A.*2d 665 (App.Div.1987) (holding that employee could maintain action against broker for broker's failure to recommend that employer obtain additional uninsured-motorist coverage for car furnished for employee's use as "[i]t was clearly foreseeable that the employee would be damaged in the event the broker did not carry out his duty to inform the insured").

In *Impex, supra,* 576 *F.Supp.* 587, on which the Appellate Division relied, 261 *N.J.Super.* at 247–48, 618 *A.*2d 870, a customer of a trucking company brought an action against the company's insurance broker, alleging that the broker's negligence in procuring liability insurance that failed to cover the customer's loss

rendered the broker liable to the customer for damages. The District Court, applying New Jersey law, found that the lack of privity between the parties was not controlling and denied the defendant broker's motion to dismiss. 576 *F.Supp.* at 590–91. The court suggested that the determinative factor was whether the defendant broker could reasonably have foreseen that a failure to exercise care in placing the insurance would result in damage to parties such as the plaintiff. *Id.* at 591. Concluding that the customer was "within the zone of a foreseeable injured party," the court held that the broker owed a duty to the customer "to exercise due care in its undertakings." *Ibid.*

We note also that commentators have recognized that

[w]hile it has been stated as a general rule that an action [against a broker or agent for failure to procure requested insurance] cannot be maintained by anyone not having an interest in the contract, * * * rights may exist in many persons other than the designated insured or applicant, and the courts ordinarily will protect such rights.

[16A Appleman, *supra*, § 8841, at 215–16.]

*See also* 8 Appleman, *supra*, § 4838, at 477 (observing that because injured party stands in shoes of the insured, injured party may have cause of action against agent or broker (citing *Eschle, supra,* 128 *N.J.Super.* 299, 319 *A.*2d 786)); *Gothberg v. Nemerovski,* 58 *Ill.App.*2d 372, 208 *N.E.*2d 12, 20 (1965) (noting that insurer's objective that insured "be directly benefited by the insurance coverage does not preclude the fact that others were also intended to be directly benefited" and that "plaintiffs' identity may not have been known at the time the contract to procure insurance was made does not prevent them from assuming the status of third party beneficiaries").

### III

We reject EMAR's contention that an insurance broker has no duty to investigate the financial security of a carrier with which it places insurance. "[A]n insurance broker, in dealing with his clients, ordinarily invites them to rely upon his expertise in

procuring insurance that best suits their requirements." *Rider, supra,* 42 *N.J.* at 477, 201 *A.*2d 561. The selection of a carrier is central to the procurement of insurance, and that selection is customarily left to the broker. Indeed, prospective insureds ordinarily retain brokers, as opposed to dealing directly with a carrier, because of brokers' superior knowledge of those carriers best suited to an insured's needs. *See First Bank & Trust v. Kraehnke,* 732 *S.W.*2d 69, 77 (Tex.Ct.App.1987) ("Frankly, most people do not know which company carries their insurance. · The insured must look to the agent he deals with to get the coverage he seeks. That carrier must be one who can, and will, properly and promptly pay claims when they are due." (citing *Cateora v. British Atl. Assurance, Ltd.,* 282 *F.Supp.* 167, 174 (S.D.Tex. 1968))).

The Appellate Division stated that "the logic of *Rider v. Lynch, supra,* necessarily requires recognition" of a broker's duty "to use reasonable skill, care and diligence in selecting a financially secure insurer." 261 *N.J.Super.* at 250, 618 *A.*2d 870. The court also noted that such a duty has been "a well-recognized general rule." *Ibid.* That general rule has been noted as well in out-of-state cases finding brokers liable for placing insurance with insolvent carriers. See, *e.g., Bordelon v. Herculean Risks, Inc.,* 241 *So.*2d 766, 769–71 (La.Ct.App.1970) (finding broker liable based on failure to abide by state statute requiring surplus-lines brokers to investigate financial condition of unauthorized insurer and on general rule requiring broker to use reasonable diligence in placing insurance); *Higginbotham, supra,* 738 *S.W.*2d at 46 (stating general rule that broker required to use reasonable skill and judgment with view to security or indemnity for which insurance is sought); *see also MacGillivary v. W. Dana Bartlett Ins. Agency,* 14 *Mass.App.Ct.* 52, 436 *N.E.*2d 964, 967 (1982) (stating broker may be liable for placing insurance policy with carrier unauthorized to do business in state in violation of Massachusetts statute if plaintiff could also show that carrier was insolvent).

That the financial health of a carrier is a primary concern of insureds and, therefore, of brokers is self-evident. Indeed, Carter Lincoln exhibited its interest in having its truck insured by a stable carrier by including in the lease agreement a provision authorizing it to approve the carrier selected. (The record does not suggest that Carter Lincoln was afforded an opportunity to exercise that authority.) That concern is reflected as well in the statutes requiring financial stability for authorized insurers and in the provision of guaranty funds. See discussion *supra* at 192–93, 638 *A.*2d at 1293.

Based on the relationship of reliance between brokers and their insureds, the foreseeable harm that may result if a carrier proves to be insolvent, and a broker's ability to protect against that harm, we conclude that brokers should perform a reasonable investigation of the carrier with which they intend to place an insured's policy. Without such an investigation, the skill or care with which all other services are performed by a broker may be rendered immaterial. If a broker discovers a prospective insurer's financial condition to be questionable, the broker should either find another carrier or at the very least disclose the information to the client so that the insured may make an informed assessment.

Although the difficulty of insuring a specific risk because of the hazard presented or because of the insured's history may be a factor affecting the options available to the broker, that difficulty does not obviate the broker's duty to perform a reasonable investigation of the insurer's financial stability. By imposing that duty, we do not transform the broker into the "guarantor of the financial condition or solvency of the company from which he obtains the insurance." 43 *Am.Jur.2d, supra, Insurance* § 143, at 228. We hold simply that the broker's recognized duty to act with reasonable care, skill, and judgment extends to the selection of an insurance carrier and includes an evaluation of the financial stability of insurance companies with which the broker intends to place insurance. Failure to comply with that duty may render the

insurance broker liable to an insured who is unable to satisfy a claim due to the insolvency of the insurer.

Our dissenting colleague agrees that if EMAR failed to place the insurance through a licensed surplus-lines agent, or if the agent failed to carry out the statutory duty to obtain security before placing the policy, both EMAR and the agent could be held liable, *post* at 208, 638 *A*.2d at 1301, but he questions the necessity for the imposition of liability on a broker who fails to make any inquiry about an insurer's solvency. We agree that the regulatory process constitutes the first line of defense against the risk of loss from insolvent carriers, and that brokers cannot be expected to undertake a sophisticated analysis of an insurer's financial statements. We also acknowledge that at trial EMAR will be free to offer proof in its defense that the policy had been placed in compliance with the statutes regulating the placement of surplus-lines insurance. Nevertheless, in the exceptional case in which the regulatory process fails but a reasonable inquiry by the broker addressed to standard industry sources would have revealed the carrier's instability, we adhere to the general rule and hold that the broker's failure to make reasonable inquiry into a carrier's financial condition could result in liability if the broker's omission is a proximate cause of the insured's loss.

■ Our inquiry does not end with the recognition of the broker's duty to investigate through reasonable inquiry the financial soundness of a carrier and to disclose relevant information to the insured. The insured, All Points, has chosen not to pursue a claim against EMAR. Carter Lincoln, the loss-payee on All Points' policy, seeks recovery based on EMAR's negligence in placing the policy with a financially unstable carrier. We therefore must determine whether the broker's duty is owed to loss-payees as well.

EMAR argues that general agency principles preclude its liability to a third party such as Carter Lincoln for economic damages arising out of its performance of duties owed to its principal, All Points. That EMAR was acting as All Points' contractual agent,

however, does not foreclose the possibility that EMAR owed duties to third parties as well. *See* Keeton et al., *supra*, § 93, at 667–68 (stating that "by entering into a contract with A, the defendant may place himself in such a relation toward B that the law will impose upon him an obligation, sounding in tort and not in contract, to act in such a way that B will not be injured").

Our cases clearly recognize that an insurance broker may owe a duty of care not only to the insured who pays the premium and with whom the broker contracts but to other parties found within the zone of harm emanating from the broker's actions as well. *See Rider, supra,* 42 *N.J.* 465, 201 *A.*2d 561 (allowing action by insured's father against broker); *Werrmann, supra,* 266 *N.J.Super.* 471, 630 *A.*2d 302 (allowing action by patron against restaurant's broker); *Walker, supra,* 216 *N.J.Super.* 255, 523 *A.*2d 665 (allowing action by employee against employer's insurance broker); *Eschle, supra,* 128 *N.J.Super.* 299, 319 *A.*2d 786 (allowing action by passenger against driver's insurance agent). The holdings in those cases proceed from a finding that the plaintiff was a foreseeable injured party and that considerations of fairness, including the broker's ability to prevent the harm, made appropriate recognition that the broker owed a duty of care to a third party. For example, in *Impex, supra,* the District Court specifically considered whether under New Jersey law "insurance brokers who owe a duty of care to those persons engaging their services also owe a duty to third persons who are potential beneficiaries of the insurance policies procured by the brokers." 576 *F.Supp.* at 589. The court determined that the broker could have foreseen that its negligent performance in obtaining liability insurance would adversely affect the insured's customers and, therefore, that Impex as a customer was well within the zone of harm. *Id.* at 591. Noting the policy behind liability insurance, " 'that all persons wrongfully injured have financially responsible persons to look to for damages,' " the court held that the broker owed a duty of care to Impex. *Ibid.* (quoting *Odolecki v. Hartford Accident & Indem. Co.,* 55 *N.J.* 542, 549, 264 *A.*2d 38 (1970)).

A reasonable broker should foresee that the failure to inquire into the financial stability of a carrier with which the insurance is placed may result in the issuance of a policy by an insolvent or marginally solvent company that may be unable to pay claims should they arise. That claimants entitled to collect under the policy will be injured should the carrier prove to be insolvent and unable to pay claims is also foreseeable. The exact identity of those claimants may be unknown at the time the broker places the insurance, but the existence of a class of claimants is predictable and indeed the insurance is procured for their protection. Although in many cases the claimant will be the insured, the increase in the use of vehicular lease-financing suggests that damage to vehicles may frequently result in claims for reimbursement by loss-payees. Loss-payees, like other claimants, are within the zone of harm emanating from a broker's negligence in failing to investigate the financial soundness of a carrier.

EMAR, as part of its obligation to exercise diligence and due care, had a duty to investigate the financial stability of American Lloyds and to disclose its findings to the insured, All Points. Because the insured alone must decide whether to place insurance with a financially questionable carrier, the broker's duty ordinarily will be satisfied by disclosure only to its insured. EMAR concedes that when it placed the policy it did not know that the carrier was not authorized to issue policies in New Jersey or that it was under conservatorship, and acknowledges that the carrier was not listed in *Best's Insurance Reports*. Nor does the record contain evidence that EMAR disclosed any information regarding the status of American Lloyds to All Points. American Lloyds proved to be insolvent when Carter Lincoln made its claim, and because the carrier was also unauthorized to issue policies in New Jersey, Carter Lincoln had no protection from the Property–Liability Insurance Guaranty Association. See *N.J.S.A.* 17:30A–5f. The harm that Carter Lincoln sustained was well within the range of risk that a reasonable broker should have foreseen as a consequence of the failure to exercise due care and diligence in selecting a carrier.

We hold that EMAR owed a duty not only to the insured but to other claimants for whose protection the insurance was procured, including loss-payees such as Carter Lincoln. The duty owed to a loss-payee derives from the duty owed to an insured. The broker is obliged to perform an investigation through reasonable inquiry of the general financial soundness of the carrier with which the broker proposes to place insurance. If that investigation reveals evidence of financial infirmity and the broker nevertheless intends to place the policy with that carrier, the broker must inform the insured of the broker's findings. In imposing that minimal duty on EMAR, we of course intimate no view on whether Carter Lincoln will sustain its burden on remand of adducing evidence sufficient to enable a jury to conclude that the duty owed by EMAR had been breached and that that breach of duty had proximately caused harm to Carter Lincoln.

## IV

The judgment of the Appellate Division is affirmed.

O'HERN, J., concurring in part and dissenting in part.

I agree that the plaintiff's complaint states a cause of action but I would not base the cause of action on so broad a duty as the majority imposes. Our Legislature has established a comprehensive system of regulations to deal with the issues that are presented in this case. We should consider whether violation of those statutory duties will resolve the issues before imposing a separate and independent duty that is realistically beyond the capacity of an insurance department, much less the capacity of an insurance broker in a small town, to fulfill.

The duty created by the majority requires the broker of insurance in Millburn, Perth Amboy or Haddonfield to undertake an independent investigation of the financial solvency of authorized, admitted or eligible insurance companies before purchasing clients' insurance from those firms. The majority minimizes the breadth of the duty imposed by pointing out that a broker may

readily investigate the status of an insurance company through *Best's Insurance Reports*. In few instances will that aid in resolving the matter. For example, the A.M. Best Company, an insurance-company rating agency, awarded an A+ rating to the Ambassador Insurance Company of Vermont in 1982. Ambassador went into receivership the following year and was adjudged insolvent and ordered to be liquidated the year after that. Roger F. Cox, *Protecting Against Insurer Insolvency*, 13–May *Pa.Law* 29 (1991).

The majority also emphasizes the fact that American Lloyds, the company that wrote the insurance policy, was operating under the protection of the Louisiana Department of Insurance at the time that it issued this policy. *Ante* at 187, 638 *A.*2d at 1290. I am not sure what inferences should be drawn from that fact. Mutual Benefit Life Insurance Company, one of the largest insurance companies in the United States, has been operating under a plan of rehabilitation administered by the New Jersey Department of Insurance since July 16, 1991. *See In re Rehabilitation of Mutual Benefit Life Ins. Co.*, 258 *N.J.Super.* 356, 359, 609 *A.*2d 768 (App.Div.1992). Not even our Insurance Department was able to forestall or foresee the financial instability of that institution. Is it realistic that individual brokers will be able to make better assessments of the net worth or solvency of such companies?

Why might one seek to impose so broad a duty? Some believe that only the imposition of such liability on parties other than state regulators will energize an ineffective insurance industry. Proponents call this the "social engineering aspect. The possibility of being held liable provides a needed incentive to the collateral parties and the states to improve the present insurer insolvency prevention mechanism such that, in the future, insureds would receive improved protection from the incidence of insolvency." Grace M. Giesel, *A Proposal for a Tort Remedy for Insureds of Insolvent Insurers Against Brokers, Excess Insurers, Reinsurers, and the State*, 52 *Ohio St.L.J.* 1075, 1075 (1991).

California sees no benefit in imposing an independent duty on brokers. It reasons that if a broker places insurance with an insurer conducting business pursuant to a certificate of authority, the broker has fulfilled its duty under that state's regulatory system and it is ineffective and inefficient to require brokers to make an independent investigation of an insurance company's financial condition. *Wilson v. All Service Ins. Corp.*, 91 *Cal. App.*3d 793, 153 *Cal.Rptr.* 121 (1979). After all, is that not the reason why an insurance department exists at all? We have hesitated to impose the simplest duty on an agent to tell an insured what kind or how much coverage to purchase, *Wang v. Allstate Insurance Co.*, 125 *N.J.* 2, 592 *A.*2d 527 (1991), and yet would impose a duty on a broker to make an independent investigation of the financial condition of an insurance company.

Insurance is one of the most highly-regulated of all industries. I would not venture to essay a comprehensive description of our regulatory system. I will attempt to set forth only what I understand to be the necessary background for this case.

The case involves the sale of what are called surplus lines of insurance. Our Court has previously summarized the essence of that industry:

> Surplus lines insurance involves New Jersey risks which insurance companies authorized or admitted to do business in this State have refused to cover by reason of the nature of the risk. In such cases, coverage may be obtained through a surplus lines agent, licensed under "the surplus lines law" of New Jersey, *N.J.S.A.* 17:22–6.40 *et seq.*, to "export" the insurance coverage—place it with an "unauthorized" insurer. The surplus lines law essentially regulates the surplus lines agents who are licensed thereunder. It also imposes limited requirements on unauthorized insurers who wish to become "eligible" to have surplus lines coverage placed with them. *N.J.S.A.* 17:22–6.43(b) & (c), –6.45, –6.46. If the surplus lines agent is unable to place the insurance with an "eligible" surplus lines insurer, however, he may then place the coverage with a surplus lines insurer who has not been granted eligibility, provided such insurer satisfies the requirements of *N.J.S.A.* 17:22–6.45(h). In short, under the surplus lines law surplus lines insurers are not authorized or admitted to transact business in this State. Rather, the insurance is "exported" and placed with them only by a *licensed surplus lines agent.*
>
> [*Railroad Roofing & Building Supply Co., Inc. v. Financial Fire & Casualty Co.*, 85 *N.J.* 384, 389, 427 *A.*2d 66 (1981) (footnote omitted) (emphasis added).]

The critical feature of such regulation is the identification of the "licensed surplus lines agent." The statute imposes very strict duties upon the licensed surplus lines agent. EMAR is not, I believe, the "licensed surplus lines agent"; that party is not before the Court. Presumably, if this case goes forward, that party may be obliged to indemnify EMAR.

Either the surplus lines agent or the surplus lines insurer must furnish the Commissioner of Insurance with copies of current financial statements, *N.J.S.A.* 17:22-6.45(c), and pay into the New Jersey Surplus Lines Insurance Guaranty Fund, *N.J.S.A.* 17:22-6.75. That guaranty fund, seemingly unique to New Jersey, provides protection for those policyholders unable to obtain insurance from regular market sources for recognized or admitted insureds. *See* Richard R. Spencer, Jr., *Surplus Lines Insurers and Guaranty Funds,* 10 *Seton Hall Legis.J.* 93 (1986). *N.J.S.A.* 17:22-6.45(h) provides that in those circumstances in which insurance coverage is not procurable from the "eligible" surplus lines insurers, the surplus lines agent may file a supplemental affidavit stating such facts and advising the Commissioner that such part of the risk as shall be unprocurable is being placed with named unauthorized insurers in stated sums. However, that section requires the named unauthorized insurer to deposit with the Commissioner, before accepting any risk in this State, an acceptable amount of United States Government bonds to be held for the benefit of New Jersey policyholders. In addition, the surplus lines agent must procure and file with the Commissioner a certified copy of the current financial statement of the unauthorized insurer. *Ibid.* Finally, whenever any risk or part thereof is placed with such an insurer, the policy, binder or cover note shall bear conspicuously on its face in boldface the following notation:

All or some of the insurers participating in this risk have not been admitted to transact business in the State of New Jersey, nor have they been approved as a surplus lines insurer by the insurance commissioner of this State. The placing of such insurance by a duly licensed surplus lines agent in this State shall not be construed as approval of such insurer by the insurance commissioner of the State of New Jersey.

[*Ibid.*]

The record does not tell us whether the surplus lines agent complied with any of these requirements. The policy documents that are in the appendix do not contain the disclaimers. At one time, our State required the surplus lines agent to maintain a bond as do many other jurisdictions; however, that is no longer the case. Presumably the Legislature concluded that the Surplus Lines Law, *N.J.S.A.* 17:22-6.40 to -6.69, and the Surplus Lines Insurance Guaranty Fund Act, *N.J.S.A.* 17:22-6.70 to -6.83, are sufficient guarantees of solvency.

As I view this case, either American Lloyds was an eligible surplus lines insurer,[1] thus making the risk eligible for insurance under the Surplus Lines Insurance Guaranty Fund Act, or American Lloyds was not an eligible surplus lines carrier, thus requiring it to post government bonds in an amount acceptable to the Commissioner before the surplus lines agent could consummate the contract of insurance under the Surplus Lines Law. If those safeguards were not followed, we have a simple case of the surplus lines agent committing an illegal act. We need not impose a broad duty on brokers of insurance everywhere to make independent financial investigations of insurance companies. Rather, we need only hold that the broker should be responsible to its customer for its breach of its statutory duty. *See Farmers & Merchants State Bank of Pierz v. Bosshart,* 400 *N.W.*2d 739 (Minn.1987). EMAR had a statutory duty to place the insurance through a licensed surplus lines agent. That agent had a duty to comply with the statutory framework. For the breach of those duties, both parties may be held liable. The time may come when this Court will have to engage in "social engineering." Giesel, *supra,* 52 *Ohio St.L.J.* at 1075. However, I do not believe that this case requires that response.

---

[1] One of the briefs refers to a letter from the Commissioner contending that American Lloyds was not eligible.

Justice GARIBALDI joins in this opinion.

*For affirmance*—Chief Justice WILENTZ, and Justices CLIFFORD, HANDLER, POLLOCK and STEIN—5.

*Concurring in part; dissenting in part*—Justices O'HERN and GARIBALDI—2.