675 A.2d 209

CIDALINA O. CARVALHO, EXECUTRIX OF THE ESTATE OF FRANCISCO F. CARVALHO, PLAINTIFF–RESPONDENT, v. TOLL BROTHERS AND DEVELOPERS, DEFENDANT AND THIRD–PARTY PLAINTIFF, AND BERGMAN HATTON ENGINEERING ASSOCIATES, DEFENDANT–APPELLANT, AND WEST WINDSOR TOWNSHIP, DEFENDANTS, AND JUDE ENTERPRISES, THIRD–PARTY DEFENDANT–RESPONDENT.

Argued October 23, 1995—Decided May 6, 1996.

*Frederick J. Schragger* argued the cause for appellant (*Mr. Schragger,* attorney; *Andrew J. Schragger,* on the briefs).

*Richard B. Gelade* argued the cause for respondent Cidalina O. Carvalho, etc.

*Robert F. Colquhoun* argued the cause for respondent Jude Enterprises (*Colquhoun & Colquhoun,* attorneys).

*Arthur Bergman* submitted a brief on behalf of *amici curiae* Consulting Engineers Council of New Jersey and The American Consulting Engineers Council (*Sokol, Behot & Fiorenzo,* attorneys).

*John S. Barnett* submitted a brief on behalf of amicus curiae New Jersey Society of Professional Engineers, Inc. (*Picco Mack Herbert,* attorneys).

The opinion of the Court was delivered by

HANDLER, J.

This case arises out of a fatal accident at a construction site. A workman was killed when the unstable walls of a deep trench in which he was working collapsed on him. An inspector hired by the project engineer, observing the work being performed at the site and aware of conditions in the trench, witnessed the accident. Under the contract with the project owner, the engineer was required to have an inspector at the construction site every day to monitor the progress of the work. The engineer did not have any contractual obligation to supervise the safety procedures of the construction.

We must decide whether an engineer has a legal duty to exercise reasonable care for the safety of workers on a construction site when the engineer has a contractual responsibility for the progress of the work but not for safety conditions yet is aware of working conditions on the construction site that create a risk of serious injury to workers.

I

In 1985, West Windsor Township ("Township") retained defendant Bergman Hatton Engineering Associates ("Bergman" or "engineer") to prepare plans for the construction of sewer service for the Assunpink Basin. Toll Brothers and Developers ("Toll") was the general contractor on the project.

In April 1987, the Township and Bergman entered into a contract, referred to as "Contract Documents for Assunpink Basin Sewerage Facilities." The contract included, by reference, provisions of the New Jersey Construction Safety Code and OSHA rules.[1]

The contract provided that "[t]renching work shall be shored, braced, or supported as conditions may warrant." The identical requirement also applied to excavation work. The section on trenching further specified that the contractor "shall control grading in a manner to prevent water running into excavations." The "Safety Requirements" in the contract, in addition to its reference to New Jersey and OSHA safety rules, referred to "the possible existence of pipe and other underground improvements which may or may not be shown on the plans." The contractor was responsible for protecting such utility pipes, whether or not they were shown in the plan. That might involve removing and then replacing them, or simply moving them. The contract stated: "The Contractor shall also, at his own expense, support and protect to the Engineer's satisfaction, all utilities that may cross the trench." Although the contract did not give the engineer control of or responsibility for the construction methods, it did contain several sections that required the general contractor to modify how it laid pipe foundation depending on whether there was a "Stable Trench Condition" or an "Unstable Trench Condition."

In May 1987, the engineer hired Bruce Stonebeck ("Stonebeck" or "inspector") as an inspector, and in October 1987, he became the site representative on the Assunpink sewer project. He was at the site daily. According to Bergman, he was hired "to inspect only the material being used and the amount of work being done at this site."

---

[1] The contract refers to New Jersey Construction Safety Codes, but the relevant code section, *N.J.A.C.* 12:180, was repealed before 1980 to allow federal OSHA rules to govern in the state. *See Meder v. Resorts Int'l Hotel, Inc.*, 240 *N.J.Super.* 470, 475–76, 573 A.2d 922 (App.Div.1989) (explaining effect of repeal), *certif. denied*, 121 *N.J.* 608, 583 A.2d 310 (1990).

The Township and the contractor, Toll, entered into a Facility Agreement, which was later signed in February 1988. The Facility Agreement covered several areas, including methods and speed of construction. Under the Facility Agreement, Toll was to construct the sewer in accordance with the Facility Documents (plans and specifications) that the engineer had prepared. Toll was to be "solely responsible for all construction means, methods, techniques, sequences and procedures utilized in connection with the Work .... TOLL shall be responsible to TOWNSHIP for the acts and omissions of its employees, subcontractors, and their agents and employees ...."

The Township assigned Bergman to be its representative at the work site. The Facility Agreement required the engineer to maintain a full-time site representative to "ensure that the work of TOLL is being performed in accordance with the requirements of the Facility Documents and of this Agreement ...." The engineer was "not [to] have control over or charge of construction means ... or programs used by TOLL." The Facility Agreement also specified, however, that the engineer had the authority to stop work on the project: "TOLL shall cause its employees, agents and subcontractors to cease the performance of the Work at the direction of the Engineer." Under the Facility Agreement, Toll worked "on an expedited basis," and was to complete the job within the time provided by a Construction Schedule approved by Bergman.[2]

In December 1987, while working in a 13–foot–deep trench, decedent Francisco Carvalho, an employee of Jude Enterprises ("Jude"), the subcontractor that Toll hired to do the excavation

---

[2] Delays were also dealt with in the Facility Agreement:

If TOLL is delayed ... by any cause beyond TOLL'S control, or by any other cause which Engineer determines justifies the delay, then TOLL'S time for performance under the Construction Schedule shall be extended for such reasonable time as Engineer shall determine. Any request for an extension of performance time provided under the Construction Schedule shall be made in writing to Engineer.

work, died when the unshored trench collapsed and crushed him. The parties agree that on the date of this accident, Defendant's site representative, Bruce Stonebeck, was present at the trench, watching the decedent working in the trench.

In May 1989, plaintiff, decedent's wife, sued engineer Bergman, contractor Toll, and the Township for wrongful death and survivorship. The trial court dismissed the complaint against the Township because plaintiff failed to comply with the notice requirements of the Tort Claims Act, *N.J.S.A.* 59:8–8. The Township is not a party to this appeal. Bergman cross-claimed against Toll for indemnification, and Toll, in turn, impled subcontractor Jude as third-party defendant for indemnification.

Plaintiff settled with Jude and Toll. Jude's insurer paid the entire settlement because it indemnified Toll. Bergman thereafter moved for summary judgment. After the completion of discovery, the trial court granted Bergman's motion. On plaintiff's appeal, the Appellate Division reversed the summary judgment in favor of Bergman. 278 *N.J.Super.* 451, 651 *A.2d* 492. We granted the petition for certification. 140 *N.J.* 326, 658 *A.2d* 726 (1995).

## II

■ The question of whether a duty to exercise reasonable care to avoid the risk of harm to another exists is one of fairness and policy that implicates many factors. *Dunphy v. Gregor*, 136 *N.J.* 99, 110, 642 *A.2d* 372 (1994). The determination of such a duty is generally considered "a matter of law properly decided by the court." *Wang v. Allstate Insurance Co.*, 125 *N.J.* 2, 15, 592 *A.2d* 527 (1991).

■ The foreseeability of harm is a significant consideration in the determination of a duty to exercise reasonable care. The "[a]bility to foresee injury to a potential plaintiff does not in itself establish the existence of a duty, but it is a crucial element in determining whether imposition of a duty on an alleged tortfeasor

is appropriate." *Carter Lincoln–Mercury, Inc. v. EMAR Group, Inc.*, 135 *N.J.* 182, 194, 638 *A.*2d 1288 (1994) (citations omitted).

■ "Once the foreseeability of an injured party is established, ... considerations of fairness and policy govern whether the imposition of a duty is warranted." *Id.* at 194–95, 638 *A.*2d 1288. The assessment of fairness and policy "involves identifying, weighing, and balancing several factors—the relationship of the parties, the nature of the attendant risk, the opportunity and ability to exercise care, and the public interest in the proposed solution." *Hopkins v. Fox & Lazo Realtors*, 132 *N.J.* 426, 439, 625 *A.*2d 1110 (1993) (citing *Goldberg v. Housing Auth.*, 38 *N.J.* 578, 583, 186 *A.*2d 291 (1962)).

■ The determination of the foreseeability of harm and considerations of fairness and policy are connected. "[T]he concept of foreseeability [subsumes] many of the concerns we acknowledge as relevant to the imposition of a duty: the relationship between the plaintiff and the tortfeasor, the nature of the risk, and the ability and opportunity to exercise care." *Carter Lincoln–Mercury, supra*, 135 *N.J.* at 194, 638 *A.*2d 1288. Nevertheless, the foreseeability of harm is susceptible to objective analysis, while the resolution of fairness and policy is a much less certain determination. "Whereas the magnitude and likelihood of potential harm are objectively determinable, the propriety of imposing a duty of care is not." *Weinberg v. Dinger*, 106 *N.J.* 469, 485, 524 *A.*2d 366 (1987). Although in many cases a duty of care can arise simply from the determination of the foreseeability of harm, usually "more is needed" to find such a duty, that " 'more' being the value judgment, based on an analysis of public policy, that the actor owed the injured party a duty of reasonable care." *Kelly v. Gwinnell*, 96 *N.J.* 538, 544, 476 *A.*2d 1219 (1984) (citing *Palsgraf v. Long Island R.R.*, 248 *N.Y.* 339, 162 *N.E.* 99 (1928)).

■ Courts consider initially the factor of foreseeability as the predicate for the duty to exercise reasonable care. The facts

in this case point clearly to the foreseeability of the risk of injury to workers in the circumstances surrounding decedent's accident. It was readily foreseeable that deep trenches posed the risk that the trench walls could collapse and seriously injure workers. The contract itself provided for the specific possibility of unstable trench conditions and prescribed contractual duties addressed to those concerns. Moreover, trenches in other areas of the site had collapsed several times during the construction. On the three days before the collapse, the workers used trench boxes to protect themselves from the chance that the trench would collapse.

Establishment of the foreseeability of the risk of injury requires the further determination of whether considerations of fairness and policy warrant imposing a duty. *Carter Lincoln–Mercury, Inc., supra,* 135 *N.J.* at 194–95, 638 *A.*2d 1288. As noted, that inquiry is multi-dimensional.

One factor bearing on considerations of fairness and policy is the relationship of the parties. Here, the relationship of the parties was contractual. That relationship contemplated the active participation and involvement by the engineer in the construction work at the site. The engineer's site representative was required to be at the construction site every day to monitor the progress of the work. The engineer's supervisory responsibility necessarily entailed the observation of existing conditions and the actual performance of the work undertaken by the workers at the site.

■ Another important consideration in assessing the relationship between the parties is the responsibility for conditions creating the risk of harm. The trial court here granted Bergman's motion for summary judgment on the grounds that the "agreement between the contractor, Toll Brothers, and the engineer, Bergman & Hatton, places any burden to ensure a safe workplace on Toll Brothers alone." The court determined that Stonebeck's and Bergman's duty was to warn the parties charged with safety,

the contractor or subcontractor, not the workers.[3]

Nevertheless, there was an overlap of work-progress considerations and work-safety concerns. Matters of construction-site safety did bear indirectly on the engineer's contractual responsibility for supervising the progress of the work. Indeed, common sense tells us that an accidental injury or death on the work site because of the failure to take safety measures would directly affect the progress of the work by bringing it to a halt.

The record strongly indicates that the engineer's responsibilities for ensuring compliance with the plans and the rate of work-progress, including the proper handling of utilities that crossed the trench, implicated safety concerns. The contract itself provided that the condition of the trenches was relevant to determining construction procedures. Stonebeck noted when there were unstable trench conditions. The engineer also had to ensure that Toll protected utility lines crossing the trench. Stonebeck and Bergman admit that compliance with the plans and the rate of progress included the proper handling of utilities that crossed the trench. Stonebeck was aware that Toll did not use a trench box because it would interfere with two utility pipes. Using trench boxes to eliminate the risk of a trench collapse would require cutting and restoring utility lines, which would slow down the work. Those circumstances demonstrate the interrelationship between safety and progress. The connection between the engineer's responsibilities over the progress of work and safety measures at the job site is relevant in determining whether it is fair to impose a duty of care addressed to work site safety conditions. *Cf. Sykes v. Propane Power Corp.,* 224 *N.J.Super.* 686, 541 *A.*2d 271 (App.Div.1988) (holding that engineer responsible only for plans to upgrade a chemical recovery plant to meet environmental regulations did not have sufficient relationship to co-worker's

---

[3] Because plaintiff settled with the contractor and subcontractor, and because Stonebeck had no "duty to warn the employees of the contractor or subcontractor," the court granted engineer Bergman's summary judgment motion.

hazardous practices that resulted in accidental explosion to warrant imposition of duty of care); *Young v. Eastern Engineering & Elevator Co.*, 381 *Pa.Super.* 428, 554 *A.*2d 77 (imposing no duty on architect who had no responsibility to supervise or control construction other than to make brief, periodic inspections of construction quality), *appeal denied*, 524 *Pa.* 608 & 611, 569 *A.*2d 1367 & 1369 (1989).

■ The element of control arising from the relationship between the parties and the opportunity and capacity of defendant to have avoided the risk of harm are also relevant in considering the fairness in imposing a duty of care. As noted, Stonebeck's job focused on compliance with the plans and the rate of progress according to the construction schedule. It was also part of Stonebeck's job to ensure that Toll protected utility lines crossing the trench. The Facility Agreement clearly required Toll to stop work at Bergman's direction. The Appellate Division stressed the fact that "Bergman had the authority to stop the job." 278 *N.J.Super.* at 462, 651 *A.*2d 492. The record thus strongly indicates that if safety conditions could affect work progress, the engineer had the authority and control to take or require corrective measures to address safety concerns.

■ The actual awareness or knowledge of the risk of harm is also significant in determining the fairness in imposing a duty of care. The record combined with all inferences favorable to plaintiff supports a factual finding that Bergman in fact knew of the danger. The inspector was at the construction site every day and monitored the trench that eventually collapsed. Trench conditions were specifically part of the engineer's contractual concerns and Stonebeck knew of the condition of the trench. Stonebeck was aware that the trench collapsed in other areas and that it was unstable in other areas including a point 200 yards from the fatal collapse one week before the accident.

■ The existence of actual knowledge of an unsafe condition can be extremely important in considering the fairness in imposing

a duty of care. Courts in several other jurisdictions have imposed a duty on a supervising architect or engineer with actual knowledge of a serious safety risk even if the supervisor never expressly assumed responsibility for safety. Frank D. Wagner, Annotation, *Liability to One Injured in Course of Construction, Based upon Architect's Alleged Failure to Carry Out Supervisory Responsibilities,* 59 *A.L.R.*3d 869 (1974). In *Balagna v. Shawnee County,* 233 *Kan.* 1068, 668 *P.*2d 157 (1983), the engineer's inspector was on site at a sewer construction project to ensure compliance with the plans; the contractor was responsible for worker safety; and a worker was killed in an unstable, unshored trench. The court imposed a duty on the engineer who had actual knowledge that the trenching operations were being carried out in violation of OSHA standards and had the authority to stop the work, or at least to say something to the contractor. *Id.* 668 *P.*2d at 164–65. *See also Miller v. DeWitt,* 37 *Ill.*2d 273, 226 *N.E.*2d 630 (1967) (imposing a duty on architects, stressing actual knowledge of a danger on the part of architects who had a contractual duty to supervise the work and power to halt work until safety precautions were taken).

We conclude that considerations of fairness and public policy require imposing a duty on Bergman and Stonebeck to exercise reasonable care to avoid the risk of injury on the construction site. The risk of serious injury from the collapse of an unstable trench was clearly foreseeable. Bergman had explicit responsibilities to have a full-time representative at the construction site to monitor the progress of the work, which implicated work-site conditions relating to worker safety. Those responsibilities related to the condition of trenches, the handling of utility lines crossing trenches, and whether measures to shore up and stabilize trenches through the use of a trench box were necessary. The engineer had sufficient control to halt work until adequate safety measures were taken. There was a sufficient connection between the engineer's contractual responsibilities and the condition and activities on the work site that created the unreasonable risk of serious injury. Further, the engineer, through its inspector, was on the

job site every day, observed the work in the trench, and, inferably, had actual knowledge of the dangerous condition.

In sum, the engineer had the opportunity and was in a position to foresee and discover the risk of harm and to exercise reasonable care to avert any harm. Under these circumstances, we hold that Bergman and Stonebeck had a duty of care to the decedent.

## III

Bergman argues that exculpatory agreements with the Township and Toll relieve it of any liability for injury at the jobsite. Bergman asserts that New Jersey law allows private parties to allocate tort liability "regardless of fault" as long as it does not violate public policy. Hence, "the courts will not enforce an exculpatory clause if . . . exoneration of the party would adversely affect the public interest." *Erlich v. First Nat'l Bank of Princeton*, 208 *N.J.Super.* 264, 287, 505 *A.2d* 220 (Law Div.1984).

In the construction context, New Jersey allows an indemnitor to indemnify an engineer for its own negligence, but not for injuries resulting totally from the engineer's negligence. *N.J.S.A.* 2A:40A–2(2) specifies that a "hold harmless" construction agreement indemnifying an architect or engineer constitutes a *per se* violation of public policy only if it indemnifies the architect or engineer for "damages . . . caused by or resulting from the *sole* negligence of the" indemnitee in the "giving of or the failure to give directions or instructions." (Emphasis added.) Hence, in circumstances involving joint-tortfeasors, as in this case, it would not be inconsistent with public policy for Toll to indemnify Bergman for Bergman's own *share* of negligence.

Bergman reasonably understood that it had no contractual obligation to address safety concerns and was not directly responsible for worker safety. Hence, the interpretation and enforcement of hold harmless agreements should be governed by the intention of the parties in providing for insurance and the division of risk. In New Jersey,

there is no essential public policy impediment to certain hold harmless agreements. The principle derives from recognition that, ordinarily, the responsibility for risk of injury is shifted by the primary parties to insurance carriers, and the parties should be left to determine how the insurance burdens shall be distributed.

[Assembly Judiciary, Law, Public Safety and Defense Cte., *Statement to Assembly Bill No. 590–L 1983, c. 107,* reprinted in *N.J.S.A.* 2A:40A–1 (paraphrasing *Doloughty v. Blanchard Constr. Co.,* 139 *N.J.Super.* 110, 116, 352 *A.2d* 613 (Law Div.1976)).]

Bergman argues that it should not be financially responsible for decedent's death because Toll was required to name Bergman as an additional insured on its insurance policy, but failed to do so. It also points out that Toll's insurer became insolvent.

We conclude that it would be unfair to exonerate Bergman from its liability to decedent on the basis of its exculpatory agreement with the Township and Toll. Their financial arrangements and understanding do not overcome the public policy that imposes a duty of care and ascribes liability to the engineer in these circumstances.

## IV

We conclude that summary judgment should not have been granted to defendants. Accordingly, we affirm the judgment of the Appellate Division and remand for trial in accordance with this opinion.

*For affirmance and remandment*—Chief Justice WILENTZ, and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI, STEIN and COLEMAN—7.

*Opposed*—None.