66 A.3d 215

ANTHONY VELLUCCI, AS EXECUTOR OF THE ESTATE OF AL-BERT D. VELLUCCI, AND ANTHONY VELLUCCI, PLAIN-TIFF–APPELLANT, v. ALLSTATE INSURANCE COMPANY (DISCOVERY ALONE); NEW JERSEY AMERICAN WATER CO., INC., AND ELIZABETHTOWN WATER CO., DEFEN-DANTS, AND MACK–CALI REAL ESTATE CORPORATION AND MACK–CALI BRIDGEWATER CO., L.P.,[1] DEFENDANTS–RESPONDENTS.

Superior Court of New Jersey
Appellate Division

---

Argued December 14, 2011—Decided May 28, 2013.

---

[1] Mack–Cali Bridgewater Realty, L.L.C., successor in interest to Mack–Cali Bridgewater Realty, L.P., improperly pleaded as Mack–Cali Bridgewater Co., L.P., and Mack–Cali Realty, L.P., improperly pleaded as Mack–Cali Real Estate Corporation.

Before Judges FUENTES, GRAVES, and KOBLITZ.

*Ronald B. Grayzel* argued the cause for appellants (*Levinson Axelrod,* attorneys; *Mr. Grayzel,* on the brief).

*Michael J. Jones* argued the cause for respondents (*Rivkin Radler, LLP,* attorneys; *Mr. Jones,* on the brief).

The opinion of the court was delivered by

FUENTES, P.J.A.D.

This is a wrongful death and survivorship action brought by plaintiff Anthony Vellucci, individually and on behalf of his late father, Albert D. Vellucci. Decedent was employed by Allstate Insurance Company [2] (Allstate) in an office located in a commercial office building in the Township of Bridgewater. The building was owned, designed, built, and managed by defendant Mack–Cali Realty, L.P. (Mack–Cali). Plaintiff [3] claims decedent contracted Legionnaires' disease in December 2004 when he was exposed to a water borne pathogen in the building's water supply system. Plaintiff also sued New Jersey American Water Co., Inc., the building's water supplier.

---

[2] Plaintiff originally named Allstate as a defendant for purposes of discovery. The trial court dismissed Allstate from the case by order dated December 10, 2010.

[3] Although we recognize that the Estate of Albert D. Vellucci and Anthony Vellucci individually assert separate claims, we will refer to "plaintiff" in the singular.

After joinder of issue and completion of extensive discovery by both sides, Mack–Cali moved for summary judgment, arguing that, under the circumstances of this case, it was not legally responsible to ensure that the building's water supply was free of the *Legionella* bacteria. It is undisputed that, prior to decedent's case, Mack–Cali did not know or have reason to know of the presence of *Legionella* bacteria in the building's water supply or in the water supply of any other properties it owns or manages throughout this country's northeastern region.[4]

The trial court granted Mack–Cali's summary judgment motion and dismissed plaintiff's case. The motion judge rejected plaintiff's theory of liability against Mack–Cali, noting the absence of a statute, regulation, or industry standard requiring Mack–Cali to take proactive measures to detect the presence of the *Legionella* bacteria in the building's water system. Under these circumstances, the court found that Mack–Cali did not violate a duty of care to decedent because "*Legionella* infection is a rare [and relatively unforeseeable] occurrence."

Plaintiff now appeals, arguing that the trial court erred in granting Mack–Cali's motion for summary judgment. According to plaintiff, Mack–Cali, as a sophisticated owner and manager of commercial properties, had a duty to maintain the building's water supply and plumbing system in a reasonably safe condition, including taking affirmative measures to detect the presence of the *Legionella* bacteria. Mack–Cali argues that the trial court cor-

---

[4] According to Mack–Cali's website, the company

is a fully integrated, self-administered, self-managed real estate investment trust (REIT) providing management, leasing, development, construction, and other tenant-related services for its class A real estate portfolio. The Company owns or has interests in 278 properties, consisting of 272 office and office/flex properties totaling approximately 31.7 million square feet and six multi-family rental properties containing over 1,700 residential units, all located in the Northeast, as well as land to accommodate additional commercial, multi-family, and hotel development.

[*Mack–Cali Realty Corporation 2012 Annual Report*, http://www.mack-cali. com/annuals/annual—12/about.html (last visited May 20, 2013).]

rectly found that, under these circumstances, it was not objectively reasonable to impose a duty upon Mack–Cali to foresee that plaintiff would contract Legionnaires' disease from the building's water supply.

After reviewing the record developed before the trial court, we conclude that summary judgment was properly granted and affirm. The prevailing industry and regulatory standards do not impose a duty on Mack–Cali to take proactive measures to ensure that a commercial office building's water supply is not contaminated by the *Legionella* bacteria. Absent evidence that Mack–Cali actually knew or should have known, through the exercise of reasonable maintenance measures, that the building's water supply had been contaminated with the *Legionella* bacteria, Mack–Cali is not liable for decedent's demise.

I

█ Because the trial court dismissed this case as a matter of law, our standard of review requires us to consider all factual allegations in the light most favorable to the non-moving party, in this case plaintiff. This standard requires us to determine " 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.' " *Brill v. Guardian Life Ins. Co. of Am.*, 142 *N.J.* 520, 536, 666 *A.*2d 146 (1995) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 *U.S.* 242, 251–52, 106 *S.Ct.* 2505, 2512, 91 *L.Ed.*2d 202, 214 (1986)); *see also R.* 4:46–2(c).

In December 2004, decedent, then fifty-three years old, began to suffer acute respiratory distress characterized by fever, shaking chills, and muscle pain. Despite his difficulty breathing, however, decedent did not suffer extensive coughing. He was admitted to Saint Claire's Hospital on December 14, 2004, and diagnosed with pneumonia. Urine samples collected over the next two days tested positive for the *Legionella* pneumophila serogroup 1 antigen, and he was subsequently diagnosed with Legionnaires' disease.

On December 21, 2004, decedent began a treatment regime of antibiotics. In a report documenting an examination he performed on decedent, Dr. Barry S. Benerofe noted that decedent's medical history revealed that he had previously suffered from pancreatitis and had had his gall bladder removed. Dr. Benerofe also noted that decedent drank alcohol and smoked cigarettes, although the actual amount and frequency of consumption of each substance was unknown. Decedent died on January 16, 2005; the cause of death was attributed to multiple organ failures precipitated by acute Legionnaires' pneumonia.

According to the National Institutes of Health:

> Legionnaires' disease is a form of pneumonia caused by *Legionella* bacteria. The disease was named after its discovery in a group of people attending an American Legion convention in 1976. *Legionella* bacteria *live in fresh water and are often found in hot tubs, air conditioning cooling units and fountains*. They cause disease when people inhale droplets of water containing the bacteria. People of all ages can get Legionnaires' disease, but it primarily affects people with weakened or compromised immune systems, including those who are over age 65, those with lung disease and smokers.

> [*Key Step Identified in Legionnaires' Infection*, NATIONAL INSTITUTES OF HEALTH (Dec. 3, 2012), http://www.nih.gov/researchmatters/june2011/06272011legionnaires. htm (emphasis added).]

The Centers for Disease Control and Prevention (CDC) estimates that between 8,000 and 18,000 people are hospitalized with Legionnaires' disease in the United States annually. Legionella (*Legionnaires' Disease and Pontiac Fever*), CDC (Feb. 5, 2013), http://www.cdc.gov/legionella/about/history.html. The symptoms of the disease are similar to other forms of pneumonia, including cough, shortness of breath, high fever, muscle aches, and headaches. Legionella (*Legionnaires' Disease and Pontiac Fever)*, CDC (Feb. 5, 2013), http://www.cdc.gov/legionella/about/signs-symptoms.html.

As part of the appellate record, plaintiff included several reports and studies from scientists who opined on the environmental conditions required for the proliferation of *Legionella*, the type of individual who would be most at risk of being exposed to the

bacteria, and the countermeasures available to eradicate or at least minimize the risk of exposure.

An example of such reports is one dated May 16, 2008, entitled "Legionella and Legionnaires' Disease," authored by microbiologist Janet E. Stout, Ph.D., director of the Special Pathogens Laboratory in Pittsburgh, Pennsylvania. According to Dr. Stout:

> Legionella are opportunistic pathogens with widespread distribution in the environment but a very low rate of infection in the general population. Legionella are transmitted directly from the environment to humans. There is no evidence of human-to-human transmission. The sources of transmission of Legionella to humans involve the aerosolization of water to contaminated Legionella and/or inhalation or aspiration. Potable water, especially in hospitals and other buildings with complex hot water systems, is considered to be the most important source of Legionella transmission.

[ (Internal citations omitted).]

Although certain personal characteristics, such as age, smoking, diabetes, chronic lung disease, hepatitis, and HIV infection, increase the risk of developing pneumonia, healthy individuals are at little risk of contracting Legionnaires' disease if exposed to the Legionella bacteria. See Legionella (Legionnaires' Disease and Pontiac Fever), CDC (Feb. 5, 2013), http://www.cdc.gov/legionella/about/people-risk.html. The CDC has also found that, even after infection, most cases of Legionnaires' disease can be successfully treated with antibiotics. Legionella (Legionnaires' Disease and Pontiac Fever), CDC (Feb. 5, 2013), http://www.cdc.gov/legionella/about/treatment-complications.html. Depending on a variety of personal factors, the CDC has determined that Legionnaires' disease can cause death in five percent to thirty percent of cases. Ibid.

According to a report entitled "LEGIONELLA 2003: An Update and Statement by the Association of Water Technologies (AWT)," [5] waterborne bacteria, including Legionella, attach to and

---

[5] In the report, AWT describes itself as follows:

> A not-for-profit, international trade association founded to serve the interests of regional water treatment companies and to advance the technologies of safe, sound and responsible water treatment practice. AWT provides edu-

proliferate in biofilms. This means that they are relatively resistant to standard water disinfection procedures. Because they are intracellular parasites of amoebae, *Legionella* are also less sensitive to the bactericidal effects of chlorine—as compared to other waterborne bacteria.

Per the AWT report, chlorination, UV irradiation, and chemical biocides offer only temporary means to eradicate *Legionella* from a water source. *Legionella* bacteria are therefore able to enter and colonize potable water supplies and "appear in many finished water supplies to homes, buildings and industry." Most relevant to this case, the report notes that "*the mere presence of* Legionella *does not, in and of itself, result in disease.* It is only when *Legionella* are able to (1) amplify (increase in population density), (2) present certain virulent factors and (3) gain transmission into the lungs of susceptible human hosts that they can cause [Legionnaires' disease] infections." (Emphasis added).

With regard to testing, AWT warns against routine testing of water systems as a reliable indicator of the absence or presence of *Legionella*. AWT points out that the CDC "advocates sampling after [Legionnaires' disease] has been found (suspected or confirmed) so as to locate the source of the *Legionella* and take remedial action. They do not encourage sampling in the absence of suspected or confirmed [Legionnaires' disease] cases."

A 1998 technical bulletin issued by two scientists associated with PathCon Laboratories [6] noted that most cases of Legionnaires'

---

cation and training, public awareness, networking, research, industry standards and resource support. Association activities are directed towards promoting the growth and development of member firms and advancing the arts and sciences of the water treatment industry.

The 2003 report is available at http://www.awt.org/IndustryResources/ Legionella03.pdf.

[6] The website describes this company as "a privately owned company headquartered in Norcross, Georgia. Founded in 1986 by former CDC scientists, the company was established to deliver services in indoor air microbiology and disease prevention to the private sector." *Company Profile*, PATHCON LABORATO-

disease "occur as sporadic cases, not epidemics, and it is not known how many organisms in a water source may represent an infectious risk for sporadic cases to occur." They also noted that there is an "honest disagreement among informed scientists on the risks associated with legionellae in the environment." There is also disagreement within the scientific and medical community over testing water systems for *Legionella* bacteria. The source of the disagreement stems from the ambiguity of test results.

> [A] negative test result does not necessarily indicate that the environmental source of a sample is free of *Legionella*. The only way to ensure that legionellosis does not occur is to eliminate *Legionella* bacteria from the environment, but research has shown that, because of the ubiquitous nature of the bacteria, it is unlikely that a water source will always remain free of legionellae. *A negative result indicates only that if present, the number of Legionella in the sample, at the time the sample was taken, was less than the detection limits of the test. The finding of low numbers of Legionella, or even negative findings, does not ensure that an environment will not be the source of legionellosis.*
>
> [ (Emphasis added).]

Plaintiff also submitted a 1996 guide published by the American Society for Testing and Materials (ASTM), entitled "Inspecting Water Systems for Legionellae and Investigating Possible Outbreaks of Legionellosis (Legionnaires' Disease and Pontiac Fever)" (Guide). In the section entitled "Environmental Testing for Legionellae in the Absence of Illness," the Guide provides the following admonition to building managers like Mack–Cali:

> Concerned employers, building owners and operators, facility managers, and others seek to prevent real and potential health hazards, if possible. Water system operators may identify undesirable situations by monitoring routinely for legionellae and may be able to implement control measures before the bacteria reach concentrations sufficient to cause human illness.
>
> Some experts advise against testing water systems for legionellae in the absence of illness given that absolute exclusion of these bacteria from water systems may not be necessary to prevent legionellosis nor may it be achievable without considerable expense. Microbiological water monitoring increases operational costs, and interpretation of test results may be difficult. Identification of legionellae in environmental samples may cause unwarranted alarm and unnecessary expensive remediation.

RIES, http://www.pathcon.com/index.php?option=com_content&task=view&id=14&Itemid=27 (last visited May 20, 2013).

[ (Internal citations omitted).]

In 2000, the American Society of Heating, Refrigerating and Air–Conditioning Engineers, Inc. (ASHRAE), produced guidelines entitled "Minimizing the Risk of Legionellosis Associated with Building Water Systems" (ASHRAE Guidelines). In the section on "Monitoring for *Legionella*," the ASHRAE Guidelines state:

> Culturing for *Legionella* may be appropriate if carried out for a specific purpose, such as verifying the effectiveness of a water treatment protocol, tracing the source of an outbreak, evaluating the potential amplifiers/transmission sources at a facility, verifying that the deco[ta]mination procedures have been effective, or in health care facilities caring for patients with exceedingly high risk of developing Legionnaire's disease (e.g., organ transplant recipients). . . .

> However, . . . routine culturing of samples from building water systems may not be predictive of the risk of transmission for the following reasons.

> 1. Presence of the organism cannot be directly equated to the risk of infection. The bacterium is frequently present in water systems without being associated with known cases of disease.

> 2. Interpretation of the results of culturing of water is confounded by use of different bacteriologic methods in various laboratories, by variable culture results among sites sampled within a water system, and by fluctuations in the concentration of *Legionella* isolated from a single site.

> 3. The risk of illness following exposure to a given source is influenced by a number of factors other than the concentration of organisms in a sample. These factors include, but are not limited to, strain virulence, host susceptibility, and how efficiently the organisms are aerosolized to the small particle size required to reach the deep portion of the human lung and remain viable.

> 4. Test results only represent the counts at the time the sample was collected. A negative result from such a sample is likely to lead to a false sense of security because any amplifier can quickly become heavily colonized if it suffers neglect.

[ (Internal footnotes omitted).]

The ASHRAE Guidelines concluded by emphasizing that "[t]esting is not a substitute for sound maintenance practices and water treatment."

## II

Mack–Cali designed, built, owned, and managed the office building in which decedent worked as an employee of Allstate when he contracted Legionnaires' disease in 2004. Mack–Cali controlled and maintained the plumbing in the building and was responsible for providing the tenants with water. Mack–Cali's building man-

ager, Ron Fratterolo, testified in his deposition that the water supply company's meter readers, who made annual or biennial visits to the property, did not test the water for contaminants. According to Fratterolo, Mack–Cali did not clean or disinfect the plumbing system in the building before decedent's illness in December 2004. James Corrigan, Mack–Cali's Vice President for Property Management, also submitted a certification in support of Mack–Cali's summary judgment motion, indicating that the company "was unaware of a single case of Legionnaires' disease ... associated with any of its buildings before [decedent]'s ... claim and is unaware of any since" this suit began.

Decedent worked on the ground floor of the building; he used the common men's bathroom located on the ground floor on a regular basis. One of decedent's coworkers testified at his deposition that he saw decedent use the sinks in this bathroom to splash water on his face.

In December 2004, Corrigan received a phone call from the regional property manager that decedent had reported his illness. In response, Corrigan retained Phase Associates, LLC, a certified industrial hygienist,[7] to investigate and take samples of the building's water for testing. According to Corrigan, the first samples were taken from "the common lavatories" of the Allstate office. This included Allstate's "little kitchenettes with sinks ... [and] three or four ice makers."

In fact, the investigation was considerably more extensive. On December 23, 2004, Phase Associates conducted a survey of the entire building and collected water samples from four locations: (1) the ground floor air conditioner's condensate pan; (2) the ground floor men's bathroom; (3) Allstate's ground floor kitchen; and (4) the ground floor kitchen ice machine. The samples were

---

[7] According to Rod Harvey, the "director of general industrial hygiene services" of the environmental consultants retained by Allstate to investigate this incident, an industrial hygienist "analyzes workplaces for hazards and potential exposures to employees, recognizes those hazards, provides information and recommendations to minimize those hazards."

tested for *Legionella* using a polymerase chain reaction (PCR) process. In a report dated January 7, 2005, Phase Associates concluded that "[t]he results of the PCR analysis showed no *Legionella* bacteria DNA at levels above the analytical method detection limit in any sample location with the exception of the ice maker in the Tenant's ground floor kitchen."

Allstate retained its own occupational and environmental health consultant, Carnow, Conibear & Associates, Ltd. (Carnow), to test the building's water system. Carnow took samples from seven locations in the building. It completed its investigation on December 27, 2004. The samples taken from the sink in the first floor men's bathroom tested positive for *Legionella*. Carnow recommended that all use of hot water piping be discontinued and that the piping be cleaned and treated. Mack–Cali hired Guardian CSC, a water treatment provider, to clean the building's plumbing system. After the remediation was completed, there was an extensive period of continued testing.

Plaintiff's expert, Dr. Washington C. Winn, Jr., opined, within a reasonable degree of medical probability, that decedent was exposed to *Legionella* at his place of employment. Dr. Winn's opinion as to the place where decedent contracted the illness was entirely predicated, however, on a report submitted by the consultants retained by Allstate. Although the report itself is not part of the appellate record, plaintiff included the relevant parts of the deposition testimony of its author, Rod Harvey.

Harvey testified that water samples taken from the men's bathroom located on the same floor as Allstate's office tested positive for *Legionella*. When asked whether there was "any particular benchmark" as to what point of concentration of *Legionella* is considered significant, Harvey gave the following response:

A. *There are no regulatory benchmarks.* There are different people that use different benchmarks, oftentimes, that are very close to each other. We generally use benchmarks supplied by Path Con Laboratories that we included in the report.

Q. What were their benchmarks?

A. Their benchmarks in potable water, we didn't—their benchmarks in potable water if it's over 100 and up to 999 would be what they call a remedial action number 5, which is on a scale of 1 to 5, and it's their highest level, and these both [samples taken from the men's bathroom] fall into that category.

Q. Were the rest of the samples negative?

A. The rest of the samples had none detected, correct.

[ (Emphasis added).]

Plaintiff retained HC Information Resources, Inc. (HC), a company that provides "Consulting, Training and Publication Research" concerning "*Legionella* and other Waterborne Pathogens." Matthew R. Freije, HC's president, who also has a Bachelor of Science degree in mechanical engineering, authored a report dated April 5, 2008. He opined, within a reasonable degree of scientific certainty, that the water he collected on December 27, 2004, from the men's bathroom located on the same floor as decedent's office "indicated a significant risk of disease."

According to Freije, the samples he collected, as tested by PathCon Laboratories, indicated the presence of *Legionella* at a level requiring immediate remediation action pursuant to the technical manual published in 1996 by the Occupational Safety and Health Administration (OSHA). Specifically, Freije stated that the OSHA manual

> calls for domestic remediation if *Legionella* is found at a concentration of 10 colony forming units per milliliter (cf/ml) or greater. The manual calls for immediate action if 100 cfu/ml or greater are detected. [The report submitted by PathCon] detected 780 cfu/ml in the hot water preflush [8] sample and 240 cf/ml in the postflush collected on 12/27/04 from the Bridgewater ground floor men's restroom.

Freije also opined that Mack–Cali "knew, or should have known, that office building water systems present a risk of Legionnaires' disease and must be maintained to minimize *Legionella* bacteria." The only support Freije offered to justify his opinion that Mack–Cali should have known or anticipated this specific *Legionella* contamination was a report of an outbreak of Legionnaires' dis-

---

8 "Preflush" refers to the temperature of the water as it first comes out of the faucet; "postflush" refers to the temperature of the water after the faucet has run for several minutes, permitting the water to reach its maximum temperature level.

ease that occurred in a Social Security office building in 1991, which Freije claimed "made national news, including an article on page A3 of the 9/29/91 issue of *USA Today*." Freije also referred to *Legionella* prevention programs which he claimed "have been widely recommended in government and industry literature for years." Freije concluded his analysis by generally referring to a series of alleged "guidelines" promulgated by a variety of governmental agencies. In our view, Freije does not offer any concrete viable support for his theory of liability against Mack–Cali.

## III

Mack–Cali moved for summary judgment, arguing that plaintiff had failed to show that it had a duty to take proactive measures to ensure that the building's water system was not compromised by the *Legionella* bacteria. Citing our decision in *Ivins v. Town Tavern*, 335 *N.J.Super.* 188, 762 *A.*2d 232 (App.Div.2000), Mack–Cali's counsel emphasized that " '[p]erhaps the most significant factor in determining the scope of a party's duty is the concept of foreseeability.' " 335 *N.J.Super.* at 195, 762 *A.*2d 232 (quoting *Taylor by Taylor v. Cutler*, 306 *N.J.Super.* 37, 42, 703 *A.*2d 294 (App.Div.1997), *aff'd*, 157 *N.J.* 525, 724 *A.*2d 793 (1999)). In this respect, Mack–Cali argued that, absent evidence of actual or constructive notice of contamination, a reasonable and competent owner/manager of a commercial office building does not have a duty to ensure that the property's water supply is not contaminated with the *Legionella* bacteria.

Plaintiff argued that foreseeability alone was not dispositive in determining whether Mack–Cali owed a duty of care to decedent and the public to ensure that the building's water supply was free of potentially deadly pathogens like the *Legionella* bacteria. In this context, plaintiff's counsel argued, "fairness" was the overriding principle. According to plaintiff, in determining whether Mack–Cali had a duty of care in this context, the trial court needed to focus on the nature of the risk. Large, sophisticated commercial landlords like Mack–Cali should be held liable to

individuals like decedent, plaintiff argued, because they are in the best position to avoid the harm. Balancing the relatively minor effort involved in conducting periodic water sampling tests against the consequences of exposure to the *Legionella* bacteria, plaintiff argued that basic fairness requires commercial landlords like Mack–Cali be held civilly liable for compensating those most affected by their failure to take basic preventive measures.

Relying on *Carvalho v. Toll Brothers & Developers,* 143 *N.J.* 565, 573–74, 675 *A.*2d 209 (1996), the motion judge agreed with Mack–Cali's argument on the importance of foreseeability in determining whether Mack–Cali should be held civilly responsible for decedent's demise. As Justice Handler noted in *Carvalho,* although foreseeability of harm alone is not sufficient to establish a duty of care, foreseeability is nevertheless " 'a crucial element in determining whether imposition of a duty on an alleged tortfeasor is appropriate.' " 143 *N.J.* at 572–73, 675 *A.*2d 209 (quoting *Carter Lincoln–Mercury, Inc. v. EMAR Grp., Inc.,* 135 *N.J.* 182, 194, 638 *A.*2d 1288 (1994)).

Examining the record developed by the parties, the motion judge noted that plaintiff had not presented any evidence that Mack–Cali disregarded any statutory or regulatory obligation to take proactive measures to test for the presence of the *Legionella* bacteria. Plaintiff also failed to come forward with any objectively reasonable evidence of the existence of an industry standard requiring operators of commercial office buildings to test periodically for the presence of *Legionella* or to take ameliorative action without any prior notice of contamination. The trial judge concluded her analysis with the following statement:

> The plaintiff offers that the building owner has an obligation to provide safeguards necessary to make its premises reasonably safe for the uses [it] has invited others to make, but the Court finds that Mack–Cali did so and that [*Legionella*] infection is a rare occurrence and that Mack–Cali owed no duty to take special precautions against [*Legionella*] bacteria, which ultimately caused [decedent]'s death, and therefore Mack–Cali's motion for summary judgment is granted.

## IV

Pursuant to *Rule* 4:46–2(c), summary judgment

shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law. An issue of fact is genuine only if, considering the burden of persuasion at trial, the evidence submitted by the parties on the motion, together with all legitimate inferences therefrom favoring the non-moving party, would require submission of the issue to the trier of fact.

The motion judge must decide whether "the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party." *Brill, supra,* 142 *N.J.* at 540, 666 *A.*2d 146. On appeal, we apply the same standard as the trial court. *Prudential Prop. & Cas. Ins. Co. v. Boylan,* 307 *N.J.Super.* 162, 167, 704 *A.*2d 597 (App.Div), *certif. denied,* 154 *N.J.* 608, 713 *A.*2d 499 (1998). Here, the trial court's ruling was based on its legal conclusion that the moving party, Mack–Cali, did not owe a duty of care to plaintiff. Because the element of duty in a claim of negligence is strictly a legal question, our scope of review is de novo. *Jerkins v. Anderson,* 191 *N.J.* 285, 294, 922 *A.*2d 1279 (2007).

In an action based on negligence, "[a] duty is an obligation imposed by law requiring one party 'to conform to a particular standard of conduct toward another.' " *Acuna v. Turkish,* 192 *N.J.* 399, 413, 930 *A.*2d 416 (2007) (quoting *Prosser & Keeton on Torts: Lawyer's Edition* § 53, at 356 (W. Page Keeton ed., 5th ed.1984)), *cert. denied,* 555 *U.S.* 813, 129 *S.Ct.* 44, 172 *L.Ed.*2d 22 (2008). "The question of whether a duty to exercise reasonable care to avoid the risk of harm to another exists is one of fairness and policy that implicates many factors." *Carvalho, supra,* 143 *N.J.* at 572, 675 *A.*2d 209 (citing *Wang. v. Allstate Ins. Co.,* 125 *N.J.* 2, 15, 592 *A.*2d 527 (1991)). As both Mack–Cali and the motion judge noted, "[t]he foreseeability of harm is a significant consideration in the determination of a duty to exercise reasonable care." *Ibid.*

As plaintiff has pointed out, however, foreseeability alone does not end the discussion. "Once the foreseeability of an injured party is established, ... considerations of fairness and policy govern whether the imposition of a duty is warranted." *Carter Lincoln–Mercury, supra,* 135 *N.J.* at 194–95, 638 *A.*2d 1288 (citing *Weinberg v. Dinger,* 106 *N.J.* 469, 485, 524 *A.*2d 366 (1987)). "The assessment of fairness and policy 'involves identifying, weighing, and balancing several factors-the relationship of the parties, the nature of the attendant risk, the opportunity and ability to exercise care, and the public interest in the proposed solution.' " *Carvalho, supra,* 143 *N.J.* at 573, 675 *A.*2d 209 (quoting *Hopkins v. Fox & Lazo Realtors,* 132 *N.J.* 426, 439, 625 *A.*2d 1110 (1993)).

Against these legal principles, we agree with the motion judge that summary judgment in favor of Mack–Cali is warranted. Plaintiff did not present any rational basis to impose a duty on Mack–Cali to foresee the advent of the *Legionella* bacteria in the building's water system. There is no statutory or regulatory scheme imposing a duty on owners and managers of commercial office buildings to take affirmative action to detect the presence of *Legionella.* The two incidents cited by plaintiff's expert occurred in 1976 and 1991 respectively, and neither one involved the transmission of the bacteria by contact with water flowing in bathroom facilities.

There are no industry standards that required Mack–Cali to have done anything more than what it did in response to the salient facts of this case. Although tragic in its result, decedent's case was an isolated one. Once relevant information concerning decedent's illness was brought to its attention, Mack–Cali took appropriate measures to investigate the matter and ascertain what needed to be done to prevent a recurrence. Under the principles articulated by the Court in *Carvalho,* we discern no legal basis to disturb the trial judge's ruling granting Mack–Cali's motion for summary judgment.

Affirmed.